**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
)
DAVID OLABAYO OLANIYI,          )
                                )
          Plaintiff,            )
                                )
     v.                         )          **Civil Action No. 05-455 (RBW)**
                                )
DISTRICT OF COLUMBIA, et. al.,  )
                                )
          Defendants.           )
_____)


**MEMORANDUM OPINION**

     Plaintiff David Olabayo Olaniyi brings this action against multiple federal and

District of Columbia ("D.C.") defendants for alleged constitutional and common-law

violations stemming from his arrest in the United States Capitol Building ("Capitol

Building" or "Capitol") on March 6, 2003.[1]  Currently before the Court is the Federal

Defendants' Motion to Dismiss Plaintiff's Amended Complaint ("Def.'s Mot."),[2] which

seeks to dispose of the <u>Bivens</u> actions filed against Officer Preston Nutwell and Officer

_____

     [1] The plaintiff sues the federal defendants pursuant to <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971), and the D.C. defendants pursuant to 42 U.S.C. § 1983 (2000).

     [2] The following papers have been submitted in connection with this motion: (1) Memorandum of Points and Authorities in Support of Federal Defendants' Motion to Dismiss ("Def.'s Mem."); (2) Plaintiff's Opposition to Federal Defendants' Motions to Dismiss ("Pl.'s Opp."); and (3) Plaintiff's Opposition to Federal Defendants' Motion to Dismiss First Amended Complaint ("Pl.'s Am. Opp.").  The federal defendants initially filed a Motion to Dismiss on May 6, 2005.  After the plaintiff filed an opposition to that motion, the federal defendants filed a Reply to Plaintiff's Opposition to Federal Defendants' Motion to Dismiss on June 24, 2005.  Ten days earlier, however, the plaintiff had filed an Amended Complaint ("Am. Compl."), which therefore had rendered moot all pending motions and associated pleadings, including the federal defendants' reply.  Although the federal defendants have now refiled their motion to dismiss the plaintiff's complaint, they did not file another reply following the filing of the plaintiff's second opposition, nor did they in any way incorporate the contents of their first reply into the motion to dismiss the plaintiff's amended complaint.  Accordingly, in deciding the federal defendants' motion to dismiss, the Court cannot, and does not, consider any arguments or factual information raised in the earlier June 24, 2005 reply.

Joseph DePalma, who are both members of the United States Capitol Police ("USCP"), and unidentified John Doe defendants employees of the USCP and the Federal Bureau of Investigation ("FBI").  For the reasons set forth below, the Court grants in part and denies in part the federal defendants' motion to dismiss.

## I.  Background

The plaintiff alleges the following facts in support of his claims.  On March 6, 2003, the plaintiff and his now-wife, Reena Patel Olaniyi, then residents of Michigan, visited the United States Capitol Building "to tour and conduct research for [the plaintiff's] stage play."[3]  Amended Complaint ("Am. Compl.") ¶¶ 3, 16.  In preparation for the visit, the plaintiff constructed and wore a costume consisting of "various materials from the D.C. environment, including newspapers, shampoo bottles, [and] empty honey jars . . . wrapped in duct tape which was formed into a harness shape over [the plaintiff's] chest."  Id. ¶ 16.   The plaintiff states that he wore the costume into the Capitol Building "in an effort to study people's interactions with him [and] spread a message of tolerance and understanding during times of war."  Id.  The plaintiff also had with him "a small, hand-carved mask sculpture," which he carried "for entertainment purposes."  Id. ¶¶ 17, 20.

Clad in his costume, the plaintiff passed through several security checkpoints before gaining entry into the Capitol Building.  Id. ¶ 18.  The first security checkpoint "consisted of a magnetometer, x-ray machines, explosive detectors, and security dogs." Id.  At the second and third checkpoints, the plaintiff was examined by metal detectors,

---

[3] The plaintiff's amended complaint states that he is "an artist, philosopher, scholar, performer, and director."  Am. Compl. ¶ 3.

including a hand-held device employed by a USCP guard.  Id.  Finally, the plaintiff was required to present a Capitol pass, id., which he presumably had obtained earlier at one of the USCP checkpoints.  At each security checkpoint, the plaintiff interacted with USCP officers and was permitted to continue further into the Capitol complex.  Id. When asked about the costume he was wearing, the plaintiff "explained to the guards that he was an artist doing research for an upcoming performance and was allowed through" the checkpoints.  Id.  Once inside the Capitol Building, the plaintiff "performed for tourists by dancing and singing."  Id. ¶ 19.  The plaintiff states that some of the tourists approached him, took photos with him, and engaged him in conversation.  Id. During these conversations, the plaintiff described his stage play "David/Dafidi" and his artistic philosophy "Life is a Performance."  Id.

The plaintiff alleges that he was then approached by one of the defendants, Officer Preston Nutwell of the USCP, while in the Crypt area of the Capitol Building.  Id. ¶ 20.  Officer Nutwell asked what the plaintiff was holding, and the plaintiff identified the object as a hand-carved mask sculpture.  Id.  After instructing the plaintiff to drop the sculpture, Officer Nutwell allegedly "grabbed the piece and shattered it on the ground." Id.  The plaintiff was then placed in handcuffs.  Id. ¶ 21.  According to the plaintiff, Officer Nutwell later stated in an affidavit that he heard the plaintiff say, "We[']re all children of Allah."[4]  Id. ¶ 20.  The plaintiff represents, however, that he "was raised Catholic, is not Islamic, and never said the word 'Allah.'"  Id.

---

[4] Neither party has introduced Officer Nutwell's affidavit, which allegedly was taken in conjunction with the plaintiff's criminal proceedings.  Am. Compl. ¶ 20.

After the plaintiff was handcuffed, "[t]hirty to forty more" officers purportedly arrived in the Crypt, including members of the Capitol Police Hazardous Device Unit ("HDU"), the FBI's Joint Terrorism Task Force, and defendant Joseph DePalma.  Id. ¶ 21.  When asked if there were wires or explosives in his costume, the plaintiff responded in the negative and stated that he was wearing the costume for artistic purposes.  Id.  The plaintiff's costume was then cut from his body and x-rayed.  Id.  The officers present at the scene determined that the costume tested negative for explosives and that the plaintiff was unarmed.  Id.

While searching the plaintiff, the officers discovered a set of keys, which the plaintiff told the officers were for the use of his van.  Id. ¶ 23.  The police located the van in the 300 block of 3rd Street NE, approximately four blocks from the Capitol Building, and conducted a warrantless and non-consensual search of the vehicle's interior.  Id.; Def.'s Mem. at 13.  The search produced no evidence of explosives, and purportedly resulted in "numerous pieces of original artwork" that were in the van being damaged or destroyed.  Am. Compl. ¶ 23.  The search of the van occurred after the police had determined that the plaintiff did not have any explosive devices on his person.  Id.; Def.'s Mem. at 13.

According to the plaintiff, an hour and a half after his initial detention in the Capitol Building, he was arrested and taken to the USCP prisoner processing center, where he was questioned "for two or three hours" by unidentified FBI agents and USCP officers.  Am. Compl. ¶ 22.  The plaintiff alleges that he requested an attorney before being questioned but was not provided one.  Id.  The plaintiff also alleges that he was

4

not informed of his <u>Miranda</u> rights[5] at the time of his arrest or at any time prior to his interrogation at the processing center.  <u>Id.</u> ¶ 56.  Following the interrogation, the plaintiff was transferred to another facility, where he was held overnight.  <u>Id.</u> ¶ 22.  It was only then that the plaintiff was afforded access to an attorney.  <u>Id.</u> ¶ 56.

On March 10, 2003, after spending three nights in the Mental Health Unit of the District of Columbia Jail,[6] the plaintiff was charged with (1) demonstrating in the Capitol Building;[7] (2) making a false bomb threat;[8] (3) aiding and abetting;[9] and (4) assault or threatened assault.[10]  <u>Id.</u> ¶ 26.  Ms. Patel Olaniyi was also charged with these same offenses, and she and the plaintiff were subsequently released on bond.  <u>Id.</u> ¶¶ 26-27. On April 1, 2003, the plaintiff and Ms. Patel Olaniyi were indicted on all of these charges.  <u>Id.</u> ¶ 27.  Both pled not guilty at their arraignment on May 29, 2003, and on

---

[5] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[6] The plaintiff also brings suit against the District of Columbia and John Doe employees of the District of Columbia Department of Corrections, alleging violations of 42 U.S.C. § 1983 and several common-law torts that allegedly occurred during the plaintiff's confinement in the Mental Health Unit.  Am. Compl. ¶¶ 25, 57-74.  Because the District of Columbia defendants are not presently moving to dismiss the claims that have been filed against them, the Court does not address these claims at this time.

[7] 40 U.S.C. § 193f(b)(7) (2000) (currently codified at 40 U.S.C.A. § 5104(e)(2)(G) (2004)). The plaintiff's amended complaint characterizes the violation of 40 U.S.C. § 193f(b)(7) as being "Disorderly Conduct on Capitol Grounds."  Am. Compl. ¶ 26.  The statutory provision, however, is more specific, and states that an individual may not "parade, demonstrate, or picket within any of the Capitol Buildings."

[8] 18 U.S.C. § 844(e) (2000).

[9] 18 U.S.C. § 2 (2000).

[10] D.C. Code § 22-404 (2001).

August 13, 2003, the Court dismissed all charges upon motion of the government.[11]  Id. ¶¶ 27-28.

On March 3, 2005, the plaintiff initiated this action, alleging violations of the First, Fourth, and Fifth Amendments against the federal defendants and seeking compensatory and punitive damages.  Compl. ¶¶ 27-40, 44; Am. Compl. ¶¶ 43-56, 75. Specifically, the plaintiff claims (1) that the federal defendants[12] violated his First Amendment rights by arresting him based on his costume and behavior, which "were forms of symbolic and political speech," Am. Compl. ¶¶ 51-52; (2) that Officer Nutwell also abridged his First Amendment rights by arresting him based in part on his alleged use of the word "Allah," id. ¶ 53; (3) that the federal defendants' detention and search of his person in the Capitol Building did not comport with the requirements of the Fourth Amendment, id. ¶¶ 45, 49; (4) that the destruction of his mask sculpture by Officer Nutwell amounted to an unconstitutional seizure under the Fourth Amendment, id. ¶ 48; (5) that the federal defendants lacked probable cause to arrest him once it was determined that he had no explosives on his person, therefore violating his Fourth Amendment rights against false arrest and imprisonment, id. ¶¶ 46, 49; (6) that the warrantless search of his van by the federal defendants, and the resulting damage and

---

[11] In his amended complaint, the plaintiff alleges that he was further harassed and threatened by Officer DePalma over a period of time beginning with the plaintiff's return to Washington, D.C., in January 2004 and culminating in a visit to the plaintiff's Iowa home soon thereafter by two named Secret Service agents who are not defendants in this action.  Am. Compl. ¶¶ 29-32.  However, the plaintiff does not make any claims for relief arising out of these allegations, see generally id. ¶¶ 43-77, and thus the Court need not consider them.

[12] Unless otherwise noted, the term "the federal defendants" as used herein is intended to refer to Officer Nutwell, Officer DePalma, and all unidentified John Doe defendants who were employed by the FBI and the USCP.

destruction of his artwork, violated the Fourth Amendment,[13] id. ¶¶ 45, 47-48; (7) that

the federal defendants violated the Fifth Amendment by failing to apprise the plaintiff of

his Miranda rights prior to his interrogation at the processing center, id. ¶ 56; and (8)

that the federal defendants violated his Fifth Amendment due process rights by denying

his request for an attorney, id.

In return, the federal defendants contend that the plaintiff's action against them

should be dismissed on two bases.[14]  First, the federal defendants argue that the Court

lacks personal jurisdiction over the unidentified USCP and FBI John Doe defendants.[15]

Def.'s Mem. at 6-7.  Second, the federal defendants claim that they are shielded from

suit for the actions alleged by virtue of their qualified immunity and that, consequently,

---

[13] The plaintiff's amended complaint is not a model of clarity, often failing to set forth with specificity which federal defendants are alleged to have committed which constitutional violations.  For example, the plaintiff alleges that "the USCP and FBI . . . conducted a search of the interior of [his] van during which numerous pieces of original artwork were destroyed," Am. Compl. ¶ 23, yet then excludes the USCP when making his claim for relief, stating that "[t]he FBI violated [his] Fourth Amendment rights by searching his van," id. ¶ 47, and that "[t]he seizure, destruction and damage to [his] art by . . . the FBI also constituted a Fourth Amendment violation," id. ¶ 48.  Moreover, the plaintiff does not make clear whether defendants Nutwell and DePalma were among the USCP officers who searched his van, a question which becomes important in the context of the Court's qualified immunity analysis.  Considering the plaintiff's factual allegations in their entirety, the plaintiff appears most likely to be claiming that Officer Nutwell and/or Officer DePalma were culpable in ordering that the plaintiff's van be searched, but that neither officer was present during the search itself.  See id. ¶ 23.  In determining whether the federal defendants are entitled to qualified immunity on each of the plaintiff's constitutional claims, the Court will couch its conclusions in language encompassing all federal defendants to whatever extent the plaintiff is alleging their individual participation in the purportedly violative conduct.

[14] The federal defendants also argue that sovereign immunity bars any claims against the defendants in their official capacity.  Def.'s Mem. at 5-6.  Because the plaintiff subsequently conceded this point and amended his complaint accordingly, the Court need not visit the question.  Pl.'s Opp. at 7-9.

[15] The federal defendants mistakenly move to dismiss the John Does under Federal Rule of Civil Procedure 12(b)(1), which governs dismissal for lack of subject-matter jurisdiction.  Def.'s Mot. at 1; Def.'s Mem. at 3-4.  The Court will treat the federal defendants' motion to dismiss for lack of personal jurisdiction as properly made under Federal Rule of Civil Procedure 12(b)(2).

the plaintiff has failed to state any claim against them upon which relief can be

granted.[16]  Id. at 7-15.  The Court will examine these arguments in turn.

## II.  Standards of Review

### A. Rule 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of

establishing that the Court has personal jurisdiction over the defendants.  Rong v.

Liaoning Provincial Gov't, 362 F. Supp. 2d 83, 90 (D.D.C. 2005) (citing Jacobsen v.

Oliver, 201 F. Supp. 2d 93, 104 (D.D.C. 2002)).  This burden, however, is "only a

minimal one," Jacobsen, 201 F. Supp. 2d at 104 (internal brackets and citation omitted),

and the plaintiff "need only make a prima facie showing of personal jurisdiction in order

to defeat [the] defendant's motion,"  Rong, 362 F. Supp. 2d at 90 (quoting Jacobsen,

201 F. Supp. 2d at 104) (internal quotation marks omitted).  Moreover, "[a]ll factual

disputes concerning jurisdiction must be resolved in favor of the plaintiff[]," id., and the

plaintiff's factual assertions "are presumed to be true unless directly contradicted by

affidavit . . . or other evidence," id. (quoting DSMC, Inc. v. Convera Corp., 273 F. Supp.

2d 14, 20 (D.D.C. 2002)) (internal quotation marks omitted).

### B. Rule 12(b)(6)

When evaluating a motion for failure to state a claim upon which relief can be

granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court "must treat the

---

[16] The memorandum submitted in support of the federal defendants' motion to dismiss states only that "[d]efendants Nutwell and DePalma are entitled to qualified immunity," and does not argue in the alternative as to the qualified immunity of the John Doe defendants in the event the Court is not persuaded that it lacks personal jurisdiction over the John Doe defendants.  Nevertheless, in the interests of judicial economy and because the factual circumstances are nearly identical as to all of the federal defendants, the Court will analyze the defendants' qualified immunity claims as to the John Doe defendants as well as Officers Nutwell and DePalma.

complaint's factual allegations as true and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow v. United Airlines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citations omitted). "Given the Federal Rules' simplified standard for pleading," a Rule 12(b)(6) complaint may be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema, 534 U.S. 506, 514 (2002) (internal quotation marks and citation omitted); see also Williams v. Chertoff, No. 05-211 (RCL), 2005 WL 3200794, *2 (D.D.C. Nov. 1, 2005) (stating that "the [Rule 12(b)(6)] movant is entitled to judgment if there are no allegations in the complaint which, even if proven, would provide a basis for recovery") (citing Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987)).  However, the Court need not accept "inferences drawn by the plaintiff if such inferences are unsupported by the facts set out in the complaint, nor legal conclusions cast in the form of factual allegations." Browning v. Clinton, 292 F. 3d 235, 242 (D.C. Cir. 2002) (internal quotation marks and citation omitted).

### III.  Legal Analysis

### A. Personal Jurisdiction Over the Unidentified John Doe Defendants

The federal John Doe defendants argue that because they have not "voluntarily ma[de] an appearance or otherwise waive[d] the lack of personal jurisdiction defense, the Court lacks personal jurisdiction" over them.[17]  Def.'s Mem. at 6.  In response, the

---

[17] The defendants incorrectly rely on Shipkovitz v. Mosbacher, No. 90-2159 (CRR), 1991 WL 251864 (D.D.C. Nov. 12, 1991), aff'd, No. 92-5030, 1992 WL 394489 (D.C. Cir. Jan. 22, 1992), for the proposition that the Court lacks personal jurisdiction over John Doe defendants who have not voluntarily appeared or otherwise waived service.  Def.'s Mem. at 6.  The Shipkovitz Court, however, held simply that
(continued...)

plaintiff states that the time prescribed by Federal Rule of Civil Procedure 4(m) to identify and serve the John Doe defendants has not yet run, and that the defendants' motion is therefore premature.  Def.'s Opp. at 18.  The Court agrees with the plaintiff.

Rule 4(m) provides that defendants shall be served "within 120 days after the filing of the complaint," and, if such service has not been timely effected, the Court "shall dismiss the action without prejudice as to the defendant or direct that service be effected within a specified time."  Fed. R. Civ. P. 4(m).  The Rule goes on to state that "if the plaintiff shows good cause for the failure [to timely serve a defendant], the [C]ourt shall extend the time for service for an appropriate period."  Id.  Here, the plaintiff's initial complaint was filed on March 3, 2005.  On June 1, 2005, well within the 120 days allowed by Rule 4(m), the plaintiff, with the consent of the defendants, moved to extend the time for identification and service of the John Doe defendants.  The plaintiff stated in his motion that because limited discovery would be necessary to identify the John Doe defendants, the time for identification and service should be extended until after the Court had ruled on the defendants' pending motions to dismiss.  Before the Court

---

[17](...continued)
in tort cases under District of Columbia law, constructive service cannot be made upon John Doe defendants as the basis for conferring personal jurisdiction over them in this Court.  Shipkovitz, 1991 WL 251864 at *5 ("[S]tate law determines whether constructive service may be made upon John Doe defendants in tort cases. . . .  Because the District of Columbia Code does not provide for such constructive service, the claims against John Doe must be dismissed for lack of personal jurisdiction.").  Here the plaintiff is not contending that the Court should recognize constructive service on the John Doe defendants, but rather that he has not had sufficient time under Rule 4(m) to identify and serve them; thus, Shipkovitz is inapposite.  More relevant to the argument at hand is M.K. v. Tenet, 99 F. Supp. 2d 12 (D.D.C. 2000).  In M.K., the defendants argued that the claims against thirty John Doe defendants allegedly employed by the CIA should be dismissed because the John Does had not been identified or served.  M.K., 99 F. Supp. 2d at 17.  The Court there noted that although the 120 day period provided by Rule 4(m) for identification and service had long since elapsed, it was nevertheless appropriate, in light of the plaintiffs' contention that some discovery was needed before identification could take place, to allow the plaintiffs additional time to identify and serve the John Does.  Id. at 17-18.

was able to grant the parties' consent motion for an extension of time, the plaintiff filed

his amended complaint.  On September 16, 2005, and December 9, 2005, the plaintiff

filed renewed motions for extensions of time to identify and serve the John Doe

defendants.  Again both motions were consented to by the federal defendants.  On

December 12, 2005, pursuant to its authority under Rule 4(m), the Court issued an

order granting the plaintiff's motions for extension of time.  In the order, the plaintiff was

directed to identify and serve all John Doe defendants by March 16, 2006.  Accordingly,

because the plaintiff still has time to identify and serve the federal John Doe

defendants, the Court denies the defendants' motion to dismiss the claims against them

on grounds of lack of personal jurisdiction.

## B.  The Federal Defendants' Assertion of Qualified Immunity

A plaintiff may bring an action for money damages against federal officials,

including law enforcement officers, in their individual capacities for alleged constitutional

violations.[18]  Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403

U.S. 388, 389 (1971).  However, the officers are entitled to qualified immunity from suit

"insofar as their conduct does not violate clearly established . . . constitutional rights of

which a reasonable person would have known."  Int'l Action Ctr. v. United States, 365

F.3d 20, 24 (D.C. Cir. 2004) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982))

(internal quotation marks omitted).  A grant of qualified immunity is thus appropriate in

circumstances in which "the burden of trial is unjustified in the face of a colorable claim

---

[18] Suits against state officials may be brought under 42 U.S.C. § 1983 (2000).  "[T]he qualified immunity analysis is identical" in both Bivens and § 1983 actions, and courts treat such actions identically in evaluating claims of qualified immunity.  Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Davis v. Scherer, 468 U.S. 183, 194 (1984) ("[T]he same qualified immunity rules apply in suits against state officers under § 1983 and suits against federal officers under [Bivens].").

that the law on point was not clear when the official took action, [or that] the action was reasonable in light of the law as it was." Will v. Hallock, 126 S. Ct. 952, 959 (2006).  In evaluating a claim of qualified immunity, the Court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right.  If the [C]ourt establishes the violation of a constitutional right, it must then proceed to determine whether that right was clearly established at the time of the alleged violation[]."  Int'l Action Ctr., 365 F.3d at 24 (quoting Wilson v. Layne, 526 U.S. 603, 609 (1999)) (internal quotation marks omitted).

Importantly, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."  Saucier v. Katz, 533 U.S. 194, 205 (2001).  Recognizing this, the Supreme Court has stated that "[i]f [an] officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense."  Id.  "This accommodation for reasonable error exists because [officers] should not err always on the side of caution because they fear being sued."  Hunter v. Bryant, 502 U.S. 224, 229 (1991) (per curiam) (internal quotation marks and citation omitted).

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation."  Hope v. Pelzer, 536 U.S. 730, 736 (2002).  "In delineating the parameters of [the asserted] constitutional right, the Court must avoid defining the right in overly general terms because to do [so] would strip the qualified immunity defense of all meaning."  Dodge v.

12

Trs. of the Nat'l Gallery of Art, 326 F. Supp. 2d 1, 12 (D.D.C. 2004) (internal quotation marks and citations omitted).  Rather, the Court must define the asserted right with sufficient specificity to "allow officials reasonably to anticipate when their conduct might give rise to liability for damages."  Butera v. District of Columbia, 235 F.3d 637, 646 (D.C. Cir. 2001) (quoting Davis v. Scherer, 468 U.S. 183, 195 (1984)) (internal quotation marks omitted).

If the Court concludes that the plaintiff has alleged the violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established."  Barham v. Ramsey, 434 F.3d 565, 572 (D.C. Cir. 2006) (quoting Saucier, 533 U.S. at 201) (internal quotation marks omitted).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (internal quotation marks omitted).  That is, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640.  This determination "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Saucier, 533 U.S. at 201.  The action in question need not have been previously held to be unlawful; however, "in light of preexisting law its unlawfulness must be apparent." Butera, 235 F.3d at 646 (quoting Anderson, 483 U.S. at 640) (internal quotation marks omitted).  Therefore, law enforcement officers "can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope, 536 U.S. at 741 (citing United States v. Lanier, 520 U.S. 259 (1997)).

13

At base, then, "the federal qualified immunity standard is an objective one; the officer's own views about whether his or her conduct violated the law are generally not relevant." Liser v. Smith, 254 F. Supp. 2d 89, 104 (D.D.C. 2003) (citing Harlow, 457 U.S. at 818). "It is no defense that an official was unaware of a law, as a reasonably competent public official should know the law governing his conduct." Barham v. Ramsey, 338 F. Supp. 2d 48, 55 (D.D.C. 2004), aff'd, 434 F.3d 565 (D.C. Cir. 2006). If the Court finds that "a reasonable officer possessing the same information" would not have believed his actions to be constitutional, then the defendant's qualified immunity claim will not prevail. Id. On the other hand, "if officers of reasonable competence could disagree on [the] issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986).

**1. The Plaintiff's First Amendment Claim**

The plaintiff contends that his arrest at the United States Capitol violated the First Amendment because his "costume and dance were forms of symbolic and political speech," and his very "presence in the Capitol amounted to symbolic, political expression."[19] Am. Compl. ¶ 52. He states that because "[h]is chanting and dancing engaged other tourists and did not disrupt Capitol security or the House of

---

[19] The plaintiff also claims a First Amendment violation because his "alleged use of the word 'Allah' predicated [his] arrest by Officer Nutwell." Am. Compl. ¶ 53. However, the plaintiff himself denies saying "Allah," id. ¶ 20, and in evaluating a motion to dismiss the Court must take all of the plaintiff's factual allegations as true, Sparrow, 215 F.3d at 113. Therefore, the plaintiff's claim is that Officer Nutwell arrested him based on something that he did not say, which does not implicate an alleged violation of the First Amendment but rather the plaintiff's Fourth Amendment claim for false arrest. To the extent that Officer Nutwell's arrest of the plaintiff was based in part on his belief (accurate or otherwise) that the plaintiff used the word "Allah," this is properly viewed not as a separately cognizable First Amendment claim, but as an additional consideration in evaluating the reasonableness of Officer Nutwell's determination that the plaintiff was unlawfully demonstrating. See Hunter, 502 U.S. at 228 (assessing the existence of probable cause requires looking to "the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information" at the time of an arrest).

Representatives," this behavior amounts to protected conduct.  Def.'s Opp. at 10.

Moreover, according to the plaintiff, he "was not demonstrating while visiting the

Capitol, but rather . . . touring while dressed in costume in an attempt to both spread a

message of peace and tolerance as well as study other tourists' interactions with him."

Id. at 11.

In turn, the federal defendants argue that it was reasonable for them to believe,

on the strength of the plaintiff's actions and appearance, that he was demonstrating

within the Capitol Building as he danced and sang for tourists, seeking "attention . . .

and interaction with onlookers" while wearing a duct tape costume.  Def.'s Mem. at 11-

12.  Because demonstrating in the Capitol is unlawful, the federal defendants posit that

the plaintiff's conduct "could have been readily perceived by a law enforcement officer"

as a violation of law, and the plaintiff therefore had no clearly established First

Amendment right to express himself as he did.  Id. at 12.  Analyzing the circumstances

confronting the officers under the qualified immunity framework, the Court agrees with

the federal defendants.

It has long been unlawful for any person "willfully and knowingly . . . to parade,

demonstrate or picket within any of the Capitol Buildings."  40 U.S.C. § 193f(b)(7)

(2000) (currently codified at 40 U.S.C.A. § 5104(e)(2)(G) (2004)).  The plaintiff does not

challenge the constitutionality of this statute, nor does he quarrel with the conclusions

of the Court in Bynum v. United States Capitol Police Bd., 93 F. Supp. 2d 50 (D.D.C.

2000), that the United States Capitol Building is a nonpublic forum for First Amendment

purposes.[20]  Am. Compl. ¶¶ 51-53; Pl.'s Opp. at 10 (stating that "even within a

nonpublic forum such as the Capitol, the type of speech exhibited by [the] plaintiff

remains protected under the First Amendment").  And this Court agrees with Judge

Friedman's conclusion in Bynum that Congress' enactment of § 193f(b)(7) "is a

viewpoint neutral, reasonable regulation of both conduct and expressive activity that

satisfies the Supreme Court's test for nonpublic fora."  Bynum, 93 F. Supp. 2d at 56.

The federal defendants' assertion of qualified immunity to the plaintiff's First

Amendment claim thus hinges on whether a reasonable officer, "possessing the same

information" as the federal defendants, could have viewed the plaintiff's behavior in the

Capitol Building as constituting an illegal demonstration within the meaning of §

193f(b)(7).  The Court answers this question in the affirmative.

By the plaintiff's own admission, his costume and expressive conduct had

political underpinnings.  Specifically, he states in his amended complaint that his

"costume was created in reaction to an announcement by then Secretary of Homeland

Security Tom Ridge instructing people to purchase duct tape to combat terrorism."  Am.

---

[20] Both parties cite Bynum in support of their positions, Def.'s Mem. at 10-11, Pl.'s Opp. at 10-12, and it is useful to briefly examine why the disposition of that case is not particularly helpful here.  The plaintiff in Bynum, a minister, challenged the validity of a USCP regulation that interpreted § 193f(b)(7) as prohibiting his tour group from conducting a quiet prayer inside the Capitol Building, in which they "prayed and meditated on topics related to the historic interpretation" of a Capitol site.  93 F. Supp. 2d at 54.  The Bynum Court determined that the purpose of § 193f(b)(7) was to prohibit disruptive and obstructive conduct in the Capitol Building, and held that the regulation swept too broadly by "allow[ing] a police officer to restrict any sort of expressive conduct when, in the eyes of the particular officer, it might attract onlookers – without regard to whether it in fact attracts a crowd of onlookers or whether it in fact disrupts or obstructs."  Id. at 58 (emphasis in original).  In the instant case, of course, the plaintiff's behavior unquestionably attracted onlookers; thus, Bynum's proscription does not apply to the situation here, where the plaintiff was clad in duct tape and honey jars and danced and sang for tourists, actions which could reasonably be seen as violating § 193f(b)(7).  Furthermore, the USCP regulation at issue in Bynum is not being challenged here; rather, the relevant inquiry in this case is whether a reasonable officer could have viewed the plaintiff's costume and expressive conduct as contravening § 193f(b)(7)'s prohibition against demonstrations in the Capitol.

Compl. ¶ 52.  The plaintiff further states that he "wore his costume so that people would learn to accept those who looked different in times of war[, and that h]e was hoping to spread a message of tolerance and understanding."  Id.  The plaintiff also "performed for tourists by dancing and singing," and willingly engaged interested observers in conversation regarding his philosophy that "Life is a Performance."  Id. ¶ 19. Nevertheless, the plaintiff contends that he was not "demonstrating" within the meaning of § 193f(b)(7), because his "use of [the] costume and duct-tape in response to the war on terror to spread a message of peace and tolerance was passive and unobtrusive." Pl.'s Opp. at 10.  Therefore, the plaintiff argues, the federal defendants infringed his right to free speech by arresting him "based on his clothing, peaceful and undisruptive interactions with other tourists, and alleged religious speech."  Id. at 12.

The Court is unconvinced by the plaintiff's argument, and declines to recognize an interstitial right to "symbolic, political expression," Am. Compl. ¶ 52, undertaken to attract attention and to disseminate a particular message, in a forum in which protest and demonstration is legitimately and concededly prohibited by the First Amendment. The plaintiff, spurred by a statement made by then-Secretary Ridge, constructed a costume composed of duct tape, honey jars, and other "materials from the D.C. environment."  Am. Compl. ¶ 16.  The plaintiff then wore the costume into the United States Capitol Building to dance and sing before a crowd of onlookers, with the stated intention of "study[ing] people's interactions with him" as he "spread a message of tolerance and understanding during times of war and . . . promote[d] acceptance of those who looked different."  Id.  Moreover, the plaintiff himself characterizes his endeavor as a form of "symbolic and political speech," id. ¶ 52, devised "in response to

17

the war on terror," Pl.'s Opp. at 10.  The Court thus concludes that it was entirely

reasonable for Officer Nutwell and the other federal defendants to believe, in light of the

information they possessed at the time, that the plaintiff was engaged in unlawful

demonstration.[21]  See Hunter, 502 U.S. at 227 (holding that "qualified immunity shields

agents . . . from suit for damages if a reasonable person could have believed [the]

arrest to be lawful, in light of clearly established law and the information the arresting

officers possessed") (internal quotation marks and citation omitted).  Accordingly, the

federal defendants are entitled to qualified immunity against the plaintiff's First

Amendment claim.

## 2. The Plaintiff's Fourth Amendment Claims

     The federal defendants also assert qualified immunity against the Fourth

Amendment claims arising out of (a) the plaintiff's initial detention by Officer Nutwell,

and the subsequent warrantless and non-consensual search of the plaintiff's person;[22]

(b) the warrantless and non-consensual search of the plaintiff's van, and the resulting

damage and destruction to the plaintiff's artwork; and (c) the warrantless arrest of the

_____

[21] The plaintiff asserts that his arrest was not made pursuant to § 193f(b)(7) because "it is
apparent from the allegations in the Complaint that [his] actions do not fall within the [statutory] prohibition"
and, thus, the federal defendants "were acting outside of their authority in arresting" him.  Pl.'s Opp. at 12.
The plaintiff then argues that "[b]ecause the arrest was based on [his] costume and his alleged use of the
word 'Allah,' and not made pursuant to a neutral statute, the officers' actions were not viewpoint neutral."
Id.  The Court is not obliged to accept "legal conclusions cast in the form of factual allegations," Browning,
292 F.3d at 242, and, as noted above, the Court disagrees that the lawfulness of the plaintiff's actions "is
apparent from the allegations in the Complaint," Pl.'s Opp. at 12.  Moreover, it is important to distinguish
the plaintiff's initial detention on suspicion of possessing a bomb, Am. Compl. ¶¶ 20-21, from his eventual
arrest for, among other things, engaging in an unlawful demonstration, id. ¶¶ 22, 26.  As the Court
discusses infra, the reasonableness of the plaintiff's detention at 1:17 p.m. and the reasonableness of his
arrest at 2:45 p.m. raise separate issues, and the plaintiff's First Amendment claim attaches only to the
latter.

[22] This claim includes Officer Nutwell's alleged destruction of the plaintiff's mask sculpture.

plaintiff on charges of engaging in an unlawful demonstration, making a false bomb threat, aiding and abetting, and assault or threatened assault.[23]  Am. Compl. ¶¶ 43-49; Def.'s Opp. at 12-13.  Broadly, the federal defendants maintain that "a reasonable, experienced police officer" would have perceived exigent circumstances sufficient to justify the plaintiff's detention and search, as well as the search of the plaintiff's van. Def.'s Mem. at 12-13 (citation omitted).  The federal defendants further state that probable cause existed to arrest the plaintiff even after the searches revealed that the plaintiff did not possess any explosives.  Id. at 12.  The plaintiff takes exception with all of the defendants' arguments.  Pl.'s Opp. at 13-16.

The Fourth Amendment prohibits law enforcement officials from engaging in "unreasonable searches and seizures" of an individual and his property.  U.S. CONST. amend. IV.  Furthermore, "[i]t is well-established that except in certain carefully defined classes of cases, a search . . . without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."  Bernstein v. Roberts, 405 F. Supp. 2d 34, 38 (D.D.C. 2005) (internal quotation marks and citation omitted).  One exception to the warrant requirement authorizes a police officer to "conduct a brief investigatory stop of an individual if [the officer] has a reasonable suspicion that criminal activity is underfoot."  United States v. Brown, 334 F.3d 1161, 1164 (D.C. Cir. 2003) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)) (internal quotation marks omitted).  A search pursuant to a Terry stop, however, must be protective in character and "strictly

---

[23] The Supreme Court has held "that qualified immunity applie[s] in the Fourth Amendment context just as it would for any other claim of official misconduct."  Saucier, 533 U.S. at 203 (quoting Anderson, 483 U.S. at 644).

circumscribed by the exigencies which justify its initiation," Terry, 392 U.S. at 25-26,

and may be made only if "a reasonably prudent man in [the officer's] circumstances

would be warranted in the belief that his safety or that of others was in danger," United

States v. Mitchell, 951 F.2d 1291, 1295 (D.C. Cir. 1991) (quoting Terry, 392 U.S. at 27).

Moreover, "a warrantless arrest by a law officer is reasonable under the Fourth

Amendment where there is probable cause to believe that a criminal offense has been

or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004) (citations

omitted). It is in this context that the Court evaluates the federal defendants' claims of

qualified immunity against the alleged Fourth Amendment violations.

### (a) The initial detention and search of the plaintiff

As noted, the qualified immunity analysis properly begins with a determination of

"whether a constitutional right would have been violated on the facts alleged." Saucier,

533 U.S. at 200. Here, the plaintiff claims that "it was objectively unreasonable to

believe that [he] was in possession of explosives . . . in light of the extraordinary

security screening procedures in place at the Capitol" and other considerations,[24] Pl.'s

Opp. at 13, and that the federal defendants therefore violated his Fourth Amendment

right to be free from unreasonable searches and seizures, Am. Compl. ¶¶ 44-45. The

federal defendants, on the other hand, state that no constitutional violation occurred

---

[24] The plaintiff argues, for example, that it was unreasonable for the federal defendants to believe that he would "contemplate detonating an explosive device in the presence of a loved one," Ms. Patel Olaniyi. Pl.'s Opp. at 14. The plaintiff also points to the fact that the federal defendants did not order the evacuation of the House of Representatives, which was then in session, as evidence that the federal defendants did not truly believe that the plaintiff was likely to be carrying explosives. Id. at 14-15. The Court accords neither of these arguments significant weight. The defendants cannot reasonably be expected to have known that the plaintiff was not prepared to harm a loved one; similarly, the defendants' ultimate failure to order the evacuation of the Capitol Building sheds minimal light on the reasonableness of their belief that the plaintiff was carrying a bomb at the time of his detention.

due to their reasonable suspicion that the plaintiff was carrying a bomb and their consequent belief that delaying their search to obtain a warrant "would gravely endanger their lives or the lives of others."  Def.'s Mem. at 13 (citation omitted).  The plaintiff does not contest that a reasonable belief in the presence of exigent circumstances would vitiate his constitutional claim regarding the initial detention and search; instead, he argues that "police could not have objectively believed that [he] was armed" and that "the USCP itself . . . did not perceive any real threat of explosives." Pl.'s Opp. at 14.  The question, then, is whether an officer in the defendants' position could have "reasonably but mistakenly conclude[d]" that exigent circumstances were present.  Anderson, 483 U.S. at 641.  If so, the federal defendants "should not be held personally liable."  Id.

The central, and strongest, aspect of the plaintiff's argument is that Officer Nutwell and the other USCP defendants were almost certainly aware of the numerous layers of security through which the plaintiff at least theoretically had to pass before entering the Capitol Building, including a magnetometer, x-ray machines, explosive detectors, and metal detectors.  Am. Compl. ¶ 18; Pl.'s Opp. at 14.  Although the USCP defendants may not have personally observed the plaintiff being screened by these stringent security procedures, it is safe to impute to them general knowledge of the many safeguards that existed to prevent weapons from entering  the Capitol Building, including verbal and physical interaction with other USCP officers at multiple checkpoints during the screening process.  Such knowledge, too, surely diminishes the likelihood that an officer could reasonably suspect, without other information, that a tourist within the Capitol could be concealing explosives.

Moreover, although the plaintiff was dressed outlandishly and drew a great deal of attention to himself, and although his actions, as discussed above, could be reasonably perceived to be unlawful demonstration, there is little in the record to suggest anything per se suspicious about the plaintiff's demeanor or conduct that would lead ineluctably to a belief that he was possibly carrying explosives.  Neither the plaintiff's costume, as he describes it, nor his interactions with other individuals, including Officer Nutwell, appear to this Court sufficient to engender particularized suspicion that the plaintiff possessed explosives.  Indeed, even the federal defendants' motion to dismiss fails to indicate otherwise, merely stating that the plaintiff "was approached by [the USCP] and detained . . . for possible possession of explosives" without providing further explanation for why the defendants had reason to believe that the plaintiff posed a security threat or was armed with an explosive device.  Def.'s Mem. at 13.  The federal defendants do not represent, and the plaintiff's complaint does not reflect, that the plaintiff made any comments or actions that could plausibly be construed as threatening, save for the brandishing of a hand-carved mask (which the plaintiff immediately identified to Officer Nutwell) and the alleged utterance of a phrase containing the world "Allah" (which the plaintiff denies making).  Am. Compl. ¶ 20; Def.'s Mem. at 12-13.  It is relatively easy, then, for this Court to conclude that a reasonable officer could have perceived that the plaintiff's behavior presented no exigencies to merit the actions taken by the defendants, based on the circumstances known to them.

That, however, is not the question for the Court to resolve.  Rather, the federal defendants are entitled to qualified immunity on the plaintiff's Fourth Amendment claim unless no reasonably competent officer could have viewed the warrantless detention

and search of the plaintiff as justified by exigent circumstances, and the Court cannot make that finding on the evidence before it.  See Malley, 475 U.S. at 341 (holding that "if officers of reasonable competence could disagree on [the] issue, immunity should be recognized").  The Court must exercise caution before infringing on the judgment calls made by law enforcement officers, particularly when those officers patrol an area of such heightened security concern as the United States Capitol.  See Hunter, 502 U.S. at 229 (stating that "officials should not err always on the side of caution because they fear being sued") (internal quotation marks and citation omitted).  This is not to say that USCP officers must always prevail against Bivens actions.  Rather, the Court is merely saying that the federal defendants' initial actions in this case were sufficiently "within the bounds of appropriate police responses," considering the circumstances, to accord them qualified immunity from suit.  Saucier, 533 U.S. at 208.

In Saucier, a demonstrator brought a claim against a military police officer for using excessive force while arresting him for protesting during a speech by then-Vice President Gore.  Id. at 198.  The Supreme Court held that the officer's use of force, even if mistakenly excessive, was nonetheless reasonable when considering "what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards."  Id. at 208.  Notably, the Saucier Court found that because the officer "did not know the full extent of the threat [the demonstrator] posed . . . [and] was required to recognize the necessity to protect the Vice President by securing [the demonstrator] and restoring order to the scene," it could not say that "there was a clearly established rule that would prohibit using the force [the officer] did . . . to accomplish those objectives."  Id. at 208-09.  Applying the reasoning of Saucier,

23

this Court similarly finds that Officer Nutwell and the other USCP defendants did not,

and could not, know the full extent of the threat posed by the plaintiff until they acted on

their suspicion and determined that he was not carrying explosives.  Furthermore, the

Court concludes that the federal defendants' belief that exigent circumstances existed,

even if ultimately mistaken, "could reasonably have been thought consistent with the

rights they are alleged to have violated."  Liser, 254 F. Supp. 2d at 104 (quoting

Anderson, 483 U.S. at 638) (internal quotation marks omitted); see also Malley, 502

U.S. at 341 (noting that the qualified immunity test "provides ample protection to all but

the plainly incompetent and those who have knowingly violate the law").  It is more than

reasonable that the plaintiff's strange costume and distinctive behavior aroused the

attention and suspicion of the USCP defendants.  Moreover, the defendants could not

know with certainty that the plaintiff had, in fact, passed through multiple security

checkpoints on his way into the Capitol Building or, if he had, that the plaintiff was not

carrying a weapon that the earlier checkpoints might have missed.  Thus, although the

federal defendants' decision to detain and search the plaintiff ultimately proved to be

unnecessary, the Court cannot say it was unreasonable.  The federal defendants are

accordingly shielded from liability against the plaintiff's Fourth Amendment claim.

**(b) The search of the plaintiff's van**

The plaintiff argues that even if the federal defendants possessed reasonable

suspicion to detain and search his person as an initial matter, "any such suspicion

dissipated after bomb technicians determined on the scene that [the plaintiff] carried no

explosives."  Pl.'s Opp. at 15.  The Court agrees, and finds that the federal defendants

are not entitled to qualified immunity against the Fourth Amendment claims arising from the search of the plaintiff's van.

"[T]he determination whether it was objectively legally reasonable to conclude that a given search was supported by . . . exigent circumstances will often require examination of the information possessed by the searching officials." Anderson, 483 U.S. at 641.  In support of their argument that the warrantless search of the plaintiff's van was made pursuant to a reasonable belief that exigent circumstances existed, the federal defendants state that "[t]he proximity of [the] Plaintiff's vehicle to the [Hart] Senate Building[,] combined with the ongoing investigation of [the] Plaintiff, at a minimum meets the standards set out . . . to act reasonably and to protect the lives of others who would be in grave danger."  Def.'s Mem. at 13.  The federal defendants, however, had no reason to believe that anyone was in grave danger at the time the van was searched.  Both sides agree that the federal defendants did not obtain information regarding the van's whereabouts until after the HDU had tested the plaintiff's costume and determined that the plaintiff was not carrying explosives, Am. Compl. ¶ 23; Def.'s Mem. at 13, and from the facts alleged, it is clear that once the search of the plaintiff's person revealed no explosives, the officers involved could not reasonably have believed that exigent circumstances "support[ed] the need for an immediate search" of the plaintiff's van. United States v. Chadwick, 433 U.S. 1, 15 (1977).

In Chadwick, the Supreme Court held that the warrantless search of an individual's foot locker, conducted more than an hour after his arrest, was not "justified by any . . . exigency," even though narcotics agents had probable cause to believe that the foot locker contained contraband.  Id.  Accordingly, "warrantless searches of

property . . . seized at the time of an arrest cannot be justified . . . if the search is remote in time or place from the arrest or no exigency exists." Id. (internal quotation marks and citation omitted).  The District of Columbia Circuit applied Chadwick in United States v. Six Hundred Thirty-Nine Thousand Five Hundred and Fifty-Eight Dollars, 955 F.2d 712 (D.C. Cir. 1992), stating that even if "an immediate search without a warrant could have been justified" in a given situation, a warrantless search cannot be sustained "after the exigency ha[s] ended."  955 F.2d at 718.  In relying on Chadwick, the Circuit Court distinguished a later case, California v. Acevedo, 500 U.S. 565 (1991), which had held that "the automobile exception permitted police, when they have probable cause, to search containers in a car without a warrant."  Six Hundred Thirty-Nine Thousand Five Hundred and Fifty-Eight Dollars, 955 F.2d at 718.

Here, the federal defendants lacked probable cause to believe that the plaintiff's van contained any explosives once no explosives were found on the plaintiff's person, and thus the absence of exigent circumstances is fatal to any qualified immunity claim as to the warrantless search of the vehicle.  Neither side has made any factual representation which, if true, would suggest that the federal defendants had a reasonable basis for searching the plaintiff's van when they did, nor do the defendants explain why the investigation of the plaintiff needed to continue after it was determined that he was unarmed.  The federal defendants had no reason to suspect that the plaintiff was carrying explosives on his person once the HDU completed its testing of the plaintiff's costume, and nothing occurred thereafter that gave the USCP or the FBI defendants cause to believe that the plaintiff's vehicle contained explosives.  See Preston v. United States, 376 U.S. 364, 367-68 (1964) (holding that a warrantless

search of a vehicle is not justified when the defendant is already in police custody); cf.

United States v. Maiden, 870 F. Supp. 359, 361 (D.D.C. 1994) (finding that "once [the

defendant] was arrested and handcuffed, there were no longer any exigent

circumstances that necessitated" a warrantless search).   The federal defendants'

contentions notwithstanding, the fact that the vehicle was parked "less than two blocks

from the Hart Senate Office Building" is plainly not enough, standing alone, to justify a

search of the van's interior, Def.'s Mem. at 13, and this was especially so when a

canine inspection of the exterior of the van produced negative results, Am. Compl. ¶

23.[25]   Thus, a reasonably competent officer should certainly have known that searching

the interior of the van would violate the plaintiff's Fourth Amendment rights.   See

Fernandors v. District of Columbia, 382 F. Supp. 2d 63, 70-71 ("An official is not

shielded from liability where he could be expected to know that certain conduct would

violate . . . constitutional rights.") (internal quotation marks and citation omitted).

Accordingly, the Court declines the invitation to dismiss the plaintiff's Fourth

Amendment claims pertaining to the search of the van's interior.

### (c) The arrest of the plaintiff

The plaintiff next contends that his warrantless arrest was unconstitutional, as

the federal defendants lacked probable cause to believe that he was committing, or had

---

[25] The inspection of the exterior of the van by "two canine technicians," Am. Compl. ¶ 23, is not itself a cognizable violation of the Fourth Amendment.  See Illinois v. Caballes, 543 U.S. 405, 410 (2005) (holding that "[a] dog sniff [of a vehicle] that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment"); see also City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000) (stating that "[t]he fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search. . . . [A]n exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics") (internal citations omitted).

committed, any criminal act.  Instead, the plaintiff claims that the arrest "was predicated on [his] robe-like clothing, dark skin, and [the] belief that he was Muslim."  Pl.'s Opp. at 16.  The Court is not persuaded by the plaintiff's argument.

A Fourth Amendment claim for false arrest requires "a showing that there was no probable cause to support a plaintiff's warrantless arrest and detention.  Probable cause to arrest exists when the facts and circumstances are sufficient to warrant a prudent person to believe that the individual has committed an offense."  Fernandors, 382 F. Supp. 2d at 71 (internal quotation marks and citations omitted); see also Hunter, 502 U.S. at 227 (holding that "qualified immunity shields agents . . . from suit for damages if a reasonable person could have believed [the] arrest to be lawful, in light of clearly established law and the information the arresting officers possessed") (internal quotation marks and citation omitted).  On the basis of the facts before the Court, it is manifestly clear that the federal defendants had no probable cause to arrest the plaintiff for making a false bomb threat.  Neither is there any evidence to suggest that a prudent person could have believed that arresting the plaintiff for assault or attempted assault would have been lawful.  However, as this Court has already determined, the federal defendants could reasonably have concluded that the plaintiff's actions amounted to an unlawful demonstration in violation of § 193f(b)(7), a criminal offense for which the punishment included up to six months' imprisonment.  40 U.S.C. § 193h(b) (2000) (current version at 40 U.S.C.A. § 5109(b) (2004)).  At the time of the plaintiff's arrest, then, "the facts and circumstances within [the federal defendants'] knowledge and of which they had reasonably trustworthy information" were enough to warrant the belief that the plaintiff "had committed or was committing an offense."  Beck v. Ohio, 379 U.S.

28

89, 91 (1964) (citation omitted).  The federal defendants are therefore shielded from suit on the false arrest claim.

### 3.  The Plaintiff's Fifth Amendment Claims

Finally, the plaintiff argues that the federal defendants violated his Fifth Amendment right to counsel when they (1) subjected him to custodial interrogation without first informing him of his due process rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and (2) failed timely to grant his request for access to an attorney. Am. Compl. ¶¶ 55-56; Pl.'s Opp. at 16-18.  The federal defendants contend in return that failure to administer Miranda warnings is not, in itself, a constitutional violation, and that while statements made in the absence of counsel once counsel has been requested may not be used to incriminate a defendant, a Fifth Amendment violation does not occur until a statement is used against a defendant in a criminal trial.  Def.'s Mem. at 14.  Because the charges against the plaintiff were dismissed before his criminal case proceeded to trial, the federal defendants argue that no statements made by the plaintiff during the custodial interrogation were ever admitted into evidence or otherwise used against him in the criminal proceeding, and the plaintiff's Fifth Amendment claim should therefore be dismissed.  Id. at 14-15.

### (a) Failure to administer the Miranda warning

Again, in assessing whether an officer is entitled to qualified immunity, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged." Saucier, 533 U.S. at 200.  If so, the Court must then determine "whether the right was clearly established" at the time of the violation.  Id.  The question here thus

turns on whether the Miranda rule could be characterized as a clearly established

constitutional right when the plaintiff was arrested.  After examining relevant legal

precedent, the Court concludes that it could not.

The Court begins by noting that if the events at issue in this litigation had

occurred several months later, it would be unquestionably clear that custodial

interrogation, without first advising an arrestee of his Miranda rights, is not an intrinsic

constitutional violation.  In May 2003, the Supreme Court decided Chavez v. Martinez,

538 U.S. 760 (2003), in which six Justices agreed that because "violations of judicially

crafted prophylactic rules do not violate the constitutional rights of any person," 538

U.S. at 772 (THOMAS, J.), the "failure to give a Miranda warning does not, without

more, establish a completed [constitutional] violation when the unwarned interrogation

ensues," id. at 789 (KENNEDY, J., concurring in part and dissenting in part).  Moreover,

Chavez cites several earlier Supreme Court cases in support of its proposition that

Miranda does not independently confer or recognize a constitutional right.  See, e.g., id.

at 772 ("Miranda's warning requirement is not itself required by the Fifth Amendment . .

. but is instead justified only by reference to its prophylactic purpose") (quoting

Connecticut v. Barrett, 479 U.S. 523, 528 (1987)) (internal quotation marks omitted);

see also United States v. Patane, 542 U.S. 630, 641 (2004) (noting that "[o]ur cases

also make clear . . . that a mere failure to give Miranda warnings does not, by itself,

violate a suspect's constitutional rights").

Indeed, rather than the recovery of civil damages, the remedy for failing to

administer Miranda warnings is the suppression and resulting inadmissibility of

unwarned statements for most purposes at a criminal trial.  See, e.g., Harris v. New

York, 401 U.S. 222, 224 (1971) (holding that "[i]t does not follow from Miranda that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards").  Neither the Supreme Court nor the District of Columbia Circuit has ever held that the failure to Mirandize an arrestee before engaging in custodial interrogation can form the basis of civil liability under Bivens or § 1983.  It is therefore difficult for this Court to see how Miranda warnings could have been considered a clearly established constitutional right at the time of the plaintiff's arrest.

The best argument the plaintiff has to the contrary revolves around Dickerson v. United States, 530 U.S. 428 (2000), which held that the Miranda requirement could not be overruled by an Act of Congress.  In reaching this conclusion, Dickerson took care to characterize the Miranda decision not merely as the creation of a prophylactic procedural safeguard, but as the recognition of a full-fledged "constitutional rule."  530 U.S. at 439 (stating that Miranda "is replete with statements indicating that the majority thought it was announcing a constitutional rule").  It is certainly possible that a USCP officer in March 2003, well-versed in constitutional law, could have understood Dickerson to have announced that failure to comply with Miranda would thenceforth be considered a constitutional violation, at least until May 2003, when the issue was clarified by Chavez.  Even Dickerson, however, did not recognize Miranda warnings as a clearly established constitutional right.  Cf. Hope, 536 U.S. at 760 (THOMAS, J., dissenting) ("In any event, an extraordinarily well-informed prison guard in 1995 . . . could have concluded only that there was a dispute as to whether handcuffing a prisoner to a restraining bar constituted an Eighth Amendment violation, not that such a

31

practice was clearly unconstitutional."). Other federal courts which addressed the question after <u>Dickerson</u> and before <u>Chavez</u> largely refused to recognize a constitutional right to <u>Miranda</u> warnings. <u>See</u>, <u>e.g.</u>, <u>United States v. Talley</u>, 275 F.3d 560, 564-65 (6th Cir. 2001) (construing <u>Dickerson</u> narrowly to avoid characterizing <u>Miranda</u> as a constitutional right); <u>Aderonmu v. Heavey</u>, No. 00-9232 (AGS), 2001 WL 77099, *3 (S.D.N.Y. Jan. 26, 2001) ("The failure to provide <u>Miranda</u> warnings, standing alone, cannot be the basis of a <u>Bivens</u> or Section 1983 action. <u>Miranda</u> warnings are not themselves a constitutional right, but merely a procedural safeguard.") (citations omitted); <u>contra</u> <u>United States v. Patane</u>, 304 F.3d 1013, 1019-20 (10th Cir. 2002), <u>rev'd</u>, 542 U.S. 630 (2004) (examining the effect of <u>Dickerson</u> on <u>Miranda</u>). The Court therefore cannot conclude, regardless of how <u>Dickerson</u> might reasonably have been read, that the plaintiff in this case had a clearly established constitutional right to be administered <u>Miranda</u> warnings. Accordingly, the federal defendants are entitled to qualified immunity as to the plaintiff's <u>Miranda</u> claim.

**(b) Failure to accede to the plaintiff's request for counsel**

A similar analysis underlies the Court's conclusion that the federal defendants are entitled to qualified immunity against the plaintiff's remaining Fifth Amendment claim. As with the constitutional nature of <u>Miranda</u> warnings, <u>Chavez</u> made explicit that the Fifth Amendment's protection against self-incrimination, which includes the right to have an attorney present during a custodial interrogation, does not attach until the statements compelled in the absence of an attorney are <u>used</u> at some point in the proceedings. <u>Chavez</u>, 538 U.S. at 766-72; <u>see</u> <u>also</u> <u>id.</u> at 777-79 (SOUTER, J., concurring). In so reasoning, the <u>Chavez</u> Court drew on the statement in <u>United States</u>

v. Verdugo-Urquidez that "[a]lthough conduct by law enforcement officers prior to trial may ultimately impair [a criminal defendant's Fifth Amendment right against self-incrimination], a constitutional violation [of the right] occurs only at trial."  494 U.S. 259, 264 (1990) (citation omitted).

The plaintiff proffers Minnick v. Mississippi, 498 U.S. 146 (1990), decided ten months after Vergudo-Urquidez, in support of the proposition that he had the constitutional right to have counsel present at his custodial interrogation.  However, Minnick's holding, that "when counsel is requested, interrogation must cease, and officers may not reinitiate interrogation without counsel present," is less helpful than the plaintiff professes.  Id. at 153.  First, Minnick says nothing to contradict the statement in Vergudo-Urquidez that a constitutional violation of the Fifth Amendment right against self-incrimination can occur "only at trial."  Vergudo-Urquidez, 494 U.S. at 264.  Second, and more damning, Minnick notes repeatedly that the right to have counsel present at an interrogation "derives from Miranda."  498 U.S. at 152.  Most notably, Minnick looks to Miranda when describing the justification for the right, stating that "the presence of counsel would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the Fifth Amendment privilege."  Id. (quoting Miranda, 384 U.S. at 466).  The plaintiff fails to cite, and the Court cannot find, any caselaw in this Circuit that treats the right to the presence of counsel during a custodial interrogation as a constitutional right distinct from Miranda's collective procedural safeguards.  With Miranda as the foundation for the right to counsel at custodial interrogations, the Court likewise concludes that no clearly established constitutional right to counsel was violated by the federal defendants in this case.  The

33

Court does not deny that law enforcement officers are required to provide criminal suspects with counsel upon request, just as they are required to administer <u>Miranda</u> warnings.  Furthermore, it is an unexceptional proposition that a reasonable officer would be aware of these requirements.  The caselaw, however, clearly distinguishes between "[r]ules designed to safeguard a constitutional right" and "the constitutional right itself," <u>Chavez</u>, 538 U.S. at 772, and places the Fifth Amendment rights asserted by the plaintiff far more securely in the former category than the latter.  The federal defendants are therefore entitled to the protection of qualified immunity against the plaintiff's Fifth Amendment right to counsel claim.

## IV.  Conclusion

For the foregoing reasons, the Court (1) denies without prejudice the federal defendants' motion to dismiss all claims against the USCP and FBI John Doe defendants for lack of personal jurisdiction; (2) denies the federal defendants' motion to dismiss the Fourth Amendment claims arising out of the warrantless search of the plaintiff's van; and (3) grants the federal defendants' motion to dismiss with respect to all other claims filed against them, due their qualified immunity from suit on these claims.

**SO ORDERED** this _____ day of February, 2006.[26]

REGGIE B. WALTON
United States District Judge

---

[26] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.