# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

DAVID OLABAYO OLANIYI,

               Plaintiff,

      v.

DISTRICT OF COLUMBIA, <u>et. al.</u>,

             Defendants.

_____

Civil Action No. 05-455 (RBW)
Civil Action No. 06-2165 (RBW)

## <u>Memorandum Opinion</u>

The plaintiff, David Olabayo Olaniyi, alleges that he was subjected to constitutional and common-law violations arising from his arrest in the United States Capitol Building in March of 2003, and from a separate incident involving a vehicle stop in the District of Columbia in January of 2004.  <u>See generally</u> Second Amended Complaint ("Am. Compl."); Complaint ("United States Compl.").[1]  There are several motions currently pending before the Court, including a motion to dismiss filed by the United States, a motion to dismiss or in the alternative for summary judgment filed by the District of Columbia, and a motion to dismiss or in the alternative for summary judgment filed by the thirty-seven individual federal defendants (the "federal defendants").  The plaintiff has filed oppositions to all of these motions.  Upon careful consideration of the parties' written submissions,[2] the applicable legal authority, and the record

---

[1] The plaintiff filed two complaints in this case that have been consolidated by the Court: one against the District of Columbia and numerous individual employees of both the District of Columbia and federal governments, filed on March 3, 2005, and ultimately amended on October 31, 2006, which will be referred to in this opinion as the plaintiff's Second Amended Complaint; and the other against the United States government, which was filed on December 20, 2006, and will be referred to in this opinion as the United States Complaint.

[2] The Court considered the following papers in resolving these motions:  (1) Defendant United States' Renewed Motion to Dismiss ("United States Mot."); (2) the United States' Reply to Plaintiff's Opposition to Defendant United States' Renewed Motion to Dismiss ("United States Reply"); (3) the District of Columbia's Motion to

(continued . . .)

(continued . . .)

in this case, for the reasons set forth below the Court will grant in part and deny in part the United States' motion to dismiss, deny the District of Columbia's motion for summary judgment without prejudice pending further discovery, and grant summary judgment to the individual federal defendants.

## I.  INTRODUCTION[3]

### A.    **Factual Background**

The facts that give rise to this case were set forth fully in the Court's prior opinion in this case.  See Olaniyi v. District of Columbia, 416 F. Supp. 2d 43, 46-48 (D.D.C. 2006).  The Court largely repeats those facts here, updating the internal citations to incorporate the Second Amended Complaint ("Am. Compl."), and providing more detail with respect to the search of the plaintiff's van.

The plaintiff, a native of Nigeria, describes himself as "an artist, philosopher, scholar, performer, and director."  Am. Compl. ¶ 3.  According to the plaintiff, on March 6, 2003, he and his current wife, Reena Patel Olaniyi, then residents of Michigan, visited the United States

---

(. . . continued)
Dismiss or Alternatively, For Summary Judgment ("District of Columbia's Mot."); (4) The District of Columbia's Reply to Plaintiff David Olaniyi's Opposition to Defendant District of Columbia's Motion to Dismiss or Alternativ[ely], for Summary Judgment ("District of Columbia's Reply"); (5) the Federal Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, or Alternatively, for Summary Judgment; Memorandum of Points and Authorities in Support of the Federal Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, or Alternatively, for Summary Judgment ("Fed. Defs.' Mem."); (6) the Federal Defendants' Reply to Plaintiff's Memorandum in Opposition to the Federal Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, or in the Alternative, for Summary Judgment, and Memorandum in Support Thereof ("Fed. Defs.' Reply"); (7) Plaintiff David Olabayo Olaniyi's Opposition to Defendant United States' Renewed Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof ("Pl.'s Opp'n to United States' Mot."); (8) Plaintiff David Olabayo Olaniyi's Opposition to Defendant District of Columbia's Motion to Dismiss or Alternatively, for Summary Judgment ("Pl.'s Opp'n to District of Columbia's Mot."); and (9) Olaniyi's Memorandum in Opposition to Federal Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, or in the Alternative, for Summary Judgment ("Pl.'s Opp'n to Fed. Defs.' Mot.").

[3] In setting forth the factual background, the Court relies on both facts contained in the amended complaint, as well as facts derived from sources outside of the complaint.  Consistent with the standards of review for the various motions that are now before the Court, see infra pp. 13-14, the Court, in deciding whether to grant the United States' motion under Federal Rule of Civil Procedure 12(b)(6), will not consider any facts that are asserted outside of the complaint, unless those facts are of the kind that the Court may take judicial notice.

Capitol Building to tour and conduct research for the plaintiff's stage play. Id. ¶¶ 3, 65-66. The plaintiff contends that the play "would illustrate to audiences across the United States the way in which objects in one's physical space tend to shade one's views of different experiences." Id. ¶ 3.

In preparation for his visit, the plaintiff constructed and wore a costume consisting of "various materials from the [District of Columbia] environment, including newspapers, shampoo bottles, [and] empty honey jars . . . wrapped in duct tape which was formed into a harness shape over [the plaintiff's] chest." Id. ¶ 66.[4] The plaintiff also carried "a small, hand-carved mask sculpture," which he had "for entertainment purposes." Id. ¶¶ 67, 70. He acknowledges that the events took place "[i]n the wake of the September 11, 2001 terrorist attacks, an atmosphere of heightened anxiety and concerns over safety and security…in the United States," which he contends "created a society filled with overzealousness and suspicion," id. ¶ 65, and states that he wore the costume "in an effort to study people's interactions with him [and] spread a message of tolerance and understanding during times of war," id. ¶ 66.

Clad in his costume, the plaintiff passed through several security checkpoints, including checkpoints equipped with a magnetometer, x-ray machine, and explosive detectors, before gaining entry into the Capitol Building. See id. ¶ 68. When asked about his costume, the plaintiff "explained to the guards that he was an artist doing research for an upcoming performance." Id. Also, once inside the Capitol Building, the plaintiff "performed for tourists by dancing and singing," and he took photos with them. Id. ¶ 69. The plaintiff also described his stage play "David/Dafidi," and his artistic philosophy as "Life is a Performance." Id.

---

[4] The federal defendants offer a very different interpretation of the plaintiff's costume, saying that it resembled a belt commonly worn by suicide bombers. Fed. Defs.' Mem. at 14.

The plaintiff alleges that while he was in the Crypt area of the Capitol Building, he was approached by Officer Preston Nutwell of the Capitol Police. Id. ¶ 70. Officer Nutwell asked what the plaintiff was holding, and the plaintiff identified the object as a hand-carved mask sculpture. Id. After instructing the plaintiff to drop the object, Officer Nutwell allegedly "grabbed the piece and shattered it on the ground." Id. The plaintiff was then handcuffed. Id. ¶ 71.[5]

After the plaintiff was handcuffed, "[t]hirty to forty more" officers, including members of the Capitol Police Hazardous Device Unit, the Federal Bureau of Investigation's ("FBI") Joint Terrorism Task Force, and Detective Joseph DePalma, arrived in the Crypt area of the Capitol Building. Id. When asked if there were wires or explosives in his costume, the plaintiff responded in the negative, stating that he was wearing the costume for artistic purposes. Id. The plaintiff's costume was then cut from his body and x-rayed. Id. It was determined that the plaintiff was unarmed, and preliminary testing conducted on the costume was negative for explosives, chemical agents, and radiation.[6] Id.; see Fed. Defs.' Mem., Exhibit ("Ex.") 2 (Declaration ("Decl.") of Robert Meikrantz) at 11-12. The plaintiff remained in custody in the Capitol Building for almost ninety minutes before being arrested. Am. Compl. ¶ 72. He contends that he was then taken to the Capitol Hill Police Processing Center and interrogated without being provided access to an attorney. Id.

In a post-arrest search of the plaintiff's person, the officers discovered a set of car keys, which the plaintiff explained were for the use of his vehicle, a black 2002 GMC Savanna van.

---

[5] According to the plaintiff, Officer Nutwell later represented that he heard the plaintiff say "were [sic] all children of 'Allah,'" which the plaintiff disputes because he "was raised Catholic, is not Islamic, and never said the word 'Allah.'" Am. Compl. ¶ 70

[6] The event did not cause the House of Representatives to be evacuated, and the Sentate was not in session when the event occurred. Am. Compl. ¶ 71.

Id. ¶ 73.  The police subsequently located the van in the 300 block of 3rd Street, NE,

approximately four blocks from the Capitol Building.  Id.; Olaniyi, 416 F. Supp. 2d at 47.

According to the federal defendants, because the plaintiff's costume resembled a vest associated

with suicide bombers, there was concern that there may be explosives inside the van or that the

plaintiff may have been engaging in a "Dry Run" to test security or observe response procedures

and capabilities at the Capitol Building.  See Fed. Defs.' Mem., Ex. 2 (Decl. of Daniel Malloy) at

9-10; id., Ex. 2 (Decl. of Gillman G. Udell) ("Udell Decl.") at 14-15.  Neighbors and restaurant

employees had reportedly told the officers that the van had expired out-of-state license plates,

had been parked in the same location for several days, and that several individuals appeared to be

living inside the vehicle.  Id., Ex. 2 (Decl. of John King) ("King Decl.") at 6-8; id., Ex. 2 (Decl.

of Daniel Malloy) at 9-10.[7]

A canine search of the van's exterior did not reveal any traces of explosives, Am. Compl.

¶ 73, but while conducting the search the Capitol Police canine officers observed large containers

in the rear of the van covered by blankets and clothing, Fed. Defs.' Mem., Ex. 2 (King Decl.) at

7; id., Ex. 2 (Decl. of John Dineen) at 4-5.[8]  Around this same time, Gillman Udell, a

Commander of the Hazardous Incident Response Division of the Capitol Police, id., Ex. 2 (Udell

Decl.) at 14, ordered that the entire block where the van was parked be cleared of vehicular and

---

[7]  The report about the van being parked in the same location for several days is incorrect, as the plaintiff had actually received a parking ticket earlier on the day of his arrest for parking in a restricted area in Arlington, Virginia.  Pl.'s Opp'n to Fed. Defs.' Mem. at ¶ 5 & Ex. B (Decl. of David Olabayo Olaniyi) ("Olaniyi Decl.").

[8]  The plaintiff argues that the officers could not have seen the inside of the van because the "van came equipped with opaque window shades on the rear and side windows," Pl.'s Opp'n to Fed. Defs.' Mot., Olaniyi Decl. ¶ 3, which the plaintiff represents were pulled down when he parked the vehicle, id. ¶ 6.  The plaintiff has submitted pictures of the van, see id., Ex. C, apparently taken while the van was in FBI custody, which the plaintiff claims show the shades pulled down, id., Olaniyi Decl. ¶ 6.  Even with the shades pulled down, however, the plaintiff acknowledges that observation into the interior of the van could be made through the windshield, as well as through the windows adjacent to the driver and front passenger seats.  Pl.'s Opp'n to Fed. Defs.' Mot. at 23.  Thus, it was possible by the plaintiff's own admission for the officers to look into the van through those several windows.

pedestrian traffic, and neighbors were told to go to the backside of their homes and seek cover until someone knocked on their doors.  Id., Ex. 2 (King. Decl.) at 7; id., Ex. 2 (Decl. of Donald Bracci) ("Bracci Decl.") at 1-3.  Captain Udell also gave clearance to bomb technicians John King and Donald Bracci to perform a diagnostic inspection of the van's exterior and interior to determine if the vehicle contained explosives or other hazardous materials.  See id., Ex. 2 (Bracci Decl.) at 2; id., Ex. 2 (King Decl.) at 7.

During their inspection of the van's exterior, agents King and Bracci confirmed that several large containers were present in the back of the van and also noticed three large unmarked glass jars containing an unknown liquid located between the van's front seats.  Id., Ex. 2 (Bracci Decl.) at 2; id., Ex. 2 (King Decl.) at 7.  The bottom portions of the glass jars, however, could not be seen by agents King and Bracci from their vantage points.  Id., Ex. 2 (King. Decl.) at 7.  After donning protective equipment to safeguard themselves from exposure to any hazardous chemicals, agents King and Bracci entered the van.  Id., Ex. 2 (Bracci Decl.) at 2.  The containers were examined as if they contained potential explosive, chemical, or incendiary hazards, and agents King and Bracci handled the items in the van with proper care.  Id., Ex. 2 (Bracci Decl.) at 3; id., Ex. 2 (King Decl.) at 8.  They determined that the containers had no wires attached to them, and that the liquid inside the containers was urine.  Fed. Defs.' Mem., Ex. 4 (Decl. of Kevin D. Finnerty) ("Finnerty Decl.") at 1-4 ¶ 5.  The containers were then packed in HAZMAT-approved containers and left inside the van.  See id., Ex. 2 (Bracci Decl.) at 3.

After the search of the van, FBI Special Agents Doug Edmonson and Kevin Finnerty discussed the incident with members of the Capitol Police.  See Fed. Defs.' Mem., Ex. 3 (Decl. of Douglas R. Edmonson) ("Edmonson Decl.") at 7-9 ¶ 3; id., Ex. 4 (Finnerty Decl.) ¶ 6.  These

officials were concerned that the plaintiff "might have been intentionally probing security at the Capitol [Building] in advance of an actual attack, or may have been [an] unwitting 'pats[y]' being used by terrorists to probe security at the Capitol," and that the van would contain evidence in this regard.  Id., Ex. 4 (Finnerty Decl.) ¶ 6.  Both agents also noted that because "Mr. Olaniyi and Ms. Patel had been arrested, [they] did not want to leave [the] van on the street and run the risk that it would be vandalized, stolen, [or] towed because of a parking violation, or perhaps driven away by an unknown third party involved in the incident."  Id.; see also id., Ex. 3 (Edmonson Decl.) ¶ 3.  In consultation with a supervisor at the FBI's Washington Field Office, agents Finnerty and Edmonson ordered that the van be impounded and towed to an FBI storage facility.  Id., Ex. 4 (Finnerty Decl.) ¶ 6; id., Ex. 3 (Edmonson Decl.) ¶ 3.  Agent Finnerty then requested that an inventory search of the van be conducted.  Id., Ex. 4 (Finnerty Decl.) ¶ 6. Analysis of the liquids retrieved from the van during the inventory search determined that they were non-hazardous.  See Fed. Defs.' Mem., Ex. 3 (Decl. of Melissa R. Godbold) at 20-23 ¶ 2. The plaintiff alleges that the conduct of the Capitol Police and FBI resulted in the destruction of "numerous pieces of original artwork" that were inside the van.  Am. Compl. ¶ 73.

Following his arrest, the plaintiff was detained overnight in a holding cell and, after a clinician assessment indicated that he had "delusions of grandeur," id. ¶¶ 74-75, was later transferred to the Mental Health Unit of the District of Columbia Jail (the "Mental Health Unit"), where he remained for approximately three nights, id. ¶¶ 74-77.  During his stay in the Mental Health Unit, clinicians informed the plaintiff that, according to test results, he was diabetic and that they would administer medication to treat the condition.  Id.  The plaintiff denied having diabetes and refused the medication, but claims that "he was told 'you can either cooperate or be physically restrained while we inject you[],'" at which point he purports to have cooperated with

the clinicians while under duress.  Id.  The plaintiff alleges that he was then "forcibly

administered a medication which caused him to lose consciousness until the following morning."

Id.  He believes the "medication was an antipsychotic drug because it caused [him] to lose

consciousness for several hours and . . . was administered through a shot into [his] upper arm

rather than a typical finger prick for diabetes testing."  Id.  Records the plaintiff later obtained

from the Mental Health Unit "indicate that [he] was 'cooperative' and 'consistent,' and that he

had no history of diabetes."  Id.

On March 10, 2003, after his release from the Mental Health Unit, the plaintiff and Ms.

Patel were charged in this Court with (1) demonstrating in the Capitol Building in violation of 40

U.S.C. § 5104(e)(2)(G) (2006);[9] (2) making a false bomb threat in violation of 18 U.S.C. §

844(e) (2006); (3) aiding and abetting in violation of 18 U.S.C. § 2 (2006); and (4) assault or

threatened assault in violation of D.C. Code § 22-404 (2001).  Olaniyi, 416 F. Supp. 2d at 48 &

nn.7-10.  They were indicted on April 1, 2003, and pleaded not guilty at their arraignment on

May 29, 2003.  Id. at 48.  On August 13, 2003, the Court dismissed all charges upon motion of

the government.  Id.

In January of 2004, the plaintiff, along with his children and Patel, returned to the District

of Columbia to retrieve several pieces of artwork that were confiscated by the Capitol Police

after the events of the previous March.  United States Compl. ¶ 34.  While driving near the

Capitol Building in the same van discussed earlier in describing the events of the previous

March, the plaintiff was pulled over by the Capitol Police.  Id.  According to the plaintiff,

Detective Joseph DePalma, one of the officers present during the plaintiff's arrest in March of

2003, although not involved in the initial stop, subsequently arrived on the scene and appeared to

---

[9]  This provision was previously codified at 40 U.S.C. § 193f(b)(7).  See Olaniyi, 416 F. Supp. 2d at 48 n.7.

be supervising the activities.  Id. ¶ 35.  Detective DePalma informed the plaintiff that his vehicle was pulled over "because there was snow on the van and because the Michigan tags made [him] 'suspicious.'"  Id.  The plaintiff claims that Detective DePalma made "several inappropriate comments" and "other intimidating remarks" to the plaintiff.  Id. ¶ 36.  These remarks included questions about "why [the plaintiff] and [his family] were back in [Washington] D.C.; why they had the children with them; whether [the plaintiff] had custody of the children; whether he had the authority to remove them from Michigan; and whether he had papers on his person authorizing their transportation."  Id.  The plaintiff also states that Detective DePalma "had dogs search the van while the children were in it."  Id. ¶ 37.

After the January 2004 vehicle stop, the plaintiff alleges a pattern of ongoing harassment and intimidation by Detective DePalma and other members of the federal government, culminating in a visit to the plaintiff's home in Iowa by Secret Service agents.  See id. ¶¶ 38-41.  According to the plaintiff, the Secret Service agents' visit was prompted by an allegation made by the plaintiff's ex-wife, who had gone to "authorities in Michigan and said [the plaintiff] was going to kill the President."  Id. ¶ 40.  During the meeting with the Secret Service agents, the plaintiff was questioned about "his life, his parents, his arrest, his travel destinations, and his immigration status," and his son was asked whether the plaintiff ever said he was going to kill the President.  Id.  The plaintiff also claims that Secret Service Agent Hull threatened him by asking what would happen if the plaintiff's immigration papers were confiscated.  Id.

**B.**    **Procedural History**

On March 3, 2005, the plaintiff initiated this action against the District of Columbia, Capitol Police officers Joseph DePalma and Preston Nutwell, a John Doe Capitol Police defendant, and a John Doe FBI defendant.  See Olaniyi, 416 F. Supp. 2d at 48-49 & n.6.  The

plaintiff alleged violations of the First, Fourth, and Fifth Amendments of the Constitution stemming from his arrest and detention in the Capitol Building and the warrantless search of his van, and constitutional and common law tort violations by the District of Columbia for conduct that allegedly transpired during the plaintiff's confinement in the Mental Health Unit.  Id. at 48-49.[10]

On February 17, 2006, the Court issued a Memorandum Opinion dismissing on qualified immunity grounds the plaintiff's First Amendment claims, id. at 55, the Fourth Amendment claims pertaining to the plaintiff's arrest and initial detention in the Capitol Building, id. at 58-59, and his Fifth Amendment claims, id. at 63.  However, the Court denied the federal defendants' motion to dismiss with respect to the Fourth Amendment claims arising from the search of the plaintiff's van.  Id. at 59-60.  As the Court explained, "the federal defendants lacked probable cause to believe that the plaintiff's van contained any explosives once no explosives were found on the plaintiff's person, and thus the absence of exigent circumstances is fatal to any qualified immunity claim as to the warrantless search of the vehicle."  Id. at 60.  The Court's prior opinion did not address the claims against the District of Columbia because it had not filed any motion to dismiss, id. at 48 n.6, or the impact of the January 2004 vehicle stop because the plaintiff had not asserted yet any specific claims arising from that incident, id. at 48 n.11.

On October 31, 2006, the plaintiff filed his Second Amended Complaint.  With the exception of naming additional federal defendants, see Am. Compl. at 1-11,[11] this complaint was

---

[10]  The plaintiff sued the individual federal defendants pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), and the District of Columbia pursuant to 42 U.S.C. § 1983 (2006).

[11]  The Second Amended Complaint names the following twenty three individuals from the United States Capitol Police:  (1) Jordan Blieden; (2) Charlie V. Boswell; (3) Donald Bracci; (4) Tyrone D. Brooks; (5) Rose B. Cabezas;

(continued . . .)

based largely on the same facts as the prior complaint, and alleged the same legal violations as set out in the first complaint, see Docket Entry 67, Notice of Filing ¶¶ 4-5.[12]

On December 20, 2006, the plaintiff filed a separate complaint against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 (2006) (the "FTCA"), alleging the following six common law violations committed by the Capitol Police and Secret Service: (1) false arrest and imprisonment associated with the plaintiff's arrest in the Capitol Building in March 2003; (2) false arrest and imprisonment associated with the vehicle stop in January 2004; (3) malicious prosecution; (4) intentional infliction of emotional distress; (5) conversion of property; and (6) loss of future earnings, humiliation, and damage to reputation. United States Compl. ¶¶ 43-72; see also Pl.'s Opp'n to United States' Mot. at 10 n.4.

On March 20, 2007, the plaintiff voluntarily dismissed his claims against all members of the District of Columbia Department of Corrections except defendants Darius Mills and Gwendolyn Gibson. See Docket Entry 94, Notice of Voluntary Dismissal of Certain Defendants

---

(. . . continued)
(6) Mark Crawford; (7) Joseph DePalma; (8) John T. Dineen; (9) Gregory W. Guthrie; (10) Noe J. Gutterez; (11) Elaine A. Hinkle; (12) Shawn K. Huycke; (13) John E. King; (14) Danny Malloy; (15) Danny L. McElroy; (16) Robert B. Meikrantz; (17) Preston Nutwell; (18) Officer Salb; (19) Ryan S. Schaur; (20) John Shark; (21) Kathleen Talbot; (22) Mary Turner; and (23) Gillman Udell. Am. Compl. at 4-7. The following fourteen members of the FBI are also named: (1) Giulio J. Arseni; (2) Jennifer Cejpeck; (3) Sandra I. Chinchilla; (4) Mary B. Collins-Morton; (5) Doug Edmonson; (6) Kevin D. Finnerty; (7) John Gardner Jr.; (8) Paul Garten; (9) Chris Ginsburg; (10) Melissa R. Godbold; (11) Ronald E. Menold II; (12) Michelle Rankin; (13) Kara D. Sidener; and (14) Gerhard S. Vienna. Id. at 8-11. The Second Amended Complaint also named thirteen individuals from the District of Columbia Department of Corrections, id. at 1-3, however, the plaintiff later voluntarily dismissed his claims against eleven of these defendants, see Docket Entry 94, leaving only claims being asserted against Darius Mills and Gwendolyn Gibson.

[12] In the Notice of Filing submitted with the Second Amended Complaint, the plaintiff explains that "[b]eyond the naming of 'John Doe' Defendants, Plaintiff's Second Amended Complaint amends Plaintiff's First Amended Complaint in such a manner as to clearly identify how Plaintiff's claims relate to the newly-named Defendants. Plaintiff's Second Amended Complaint in no way expands or alters its claims against previously named Defendants." Docket Entry 67, Notice of Filing ¶ 5. The plaintiff also indicated that he had "re-allege[d] against the newly-named Defendants all of the claims originally filed against the Federal Defendants, as appropriate, in order to preserve for the record Plaintiff's right to appeal the [Court's] February 17, 2006 Memorandum Opinion." Id. ¶ 2. The Court subsequently dismissed all of the claims that the plaintiff asserted against the newly named federal defendants, with the exception of the Fourth Amendment claims arising out of the search of the plaintiff's van. See Order at 3-4, Olaniyi v. Dist. of Columbia, Civil Action No. 05-455 (RBW) (D.D.C. Nov. 10, 2006), ECF No. 69.

¶ 4.  Defendant Mills, proceeding <u>pro se</u>, then filed an "Answer to and Request for Dismissal Based on Lack of Merit," Docket Entry 139, which the Court ultimately construed as an answer. Docket Entry 140.[13]  Defendant Gibson has not filed any response in this case, and a default was entered against her on May 31, 2007.  Docket Entry 113.

As noted at the outset of this opinion, the United States, the District of Columbia, and the individual federal defendants have filed either motions to dismiss or, alternatively, motions for summary judgment.  The defendants assert a number of arguments in support of their respective motions, and the Court will examine each defendant's arguments in turn.

## II.  STANDARDS OF REVIEW

**A.**     **Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)**

A motion for dismissal under Rule 12(b)(1) "presents a threshold challenge to the court's jurisdiction . . . ."  <u>Haase v. Sessions</u>, 835 F.2d 902, 906 (D.C. Cir. 1987); <u>see also</u> <u>Grand Lodge Fraternal Order of Police v. Ashcroft</u>, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (noting that a Rule 12(b)(1) motion imposes an affirmative obligation on the court to ensure it is acting within its jurisdictional authority).  Specifically, the Court may dismiss a claim if the Court "lack[s] . . . subject matter jurisdiction" to entertain it.  Fed. R. Civ. P. 12(b)(1).  Under Rule 12(b)(1), "it is presumed that a cause lies outside [the federal courts'] limited jurisdiction," <u>Kokkonen v. Guardian Life Ins. Co.</u>, 511 U.S 375, 377 (1994), and the plaintiff bears the burden of establishing the Court's jurisdiction by a preponderance of the evidence, <u>see, e.g.</u>, <u>Moore v. Bush</u>, 535 F. Supp. 2d 46, 47 (D.D.C. 2008).  In deciding a motion to dismiss based upon lack of subject matter jurisdiction, a Court is not limited to the allegations set forth in the complaint, but "may consider materials outside the pleadings."  <u>Jerome Stevens Pharms., Inc. v. FDA</u>, 402 F.3d

---

[13]  Because defendant Mills' filing was construed as an answer and not a motion to dismiss, the Court does not address the plaintiff's claims against defendant Mills.

1249, 1253 (D.C. Cir. 2005). However, when reviewing a motion to dismiss pursuant to Rule 12(b)(1), the Court is required to accept as true all factual allegations contained in the complaint. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).

**B.**     **Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

On the other hand, a motion to dismiss under Rule 12(b)(6) tests whether a complaint has properly stated a claim upon which relief may be granted. Woodruff v. DiMario, 197 F.R.D. 191, 193 (D.D.C. 2000). For a complaint to survive a Rule 12(b)(6) motion, it need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), which is sufficient to "give the defendant fair notice of what the claim is and the grounds on which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Although Federal Rule of Civil Procedure 8(a) does not require "detailed factual allegations," a plaintiff is required to provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," Ashcroft v. Iqbal, __ U.S. __, __, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. at 555 (internal quotation omitted)). In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, __U.S. at __, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556). A complaint alleging facts which are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. (quoting Twombly 550 U.S. at 557 (internal quotation marks omitted))..

In evaluating a Rule 12(b)(6) motion under this framework, "[t]he complaint must be liberally construed in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," <u>Schuler v. United States</u>, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotation marks and citations omitted), and the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice," <u>E.E.O.C. v. St. Francis Xavier Parochial Sch.</u>, 117 F.3d 621, 624 (D.C. Cir. 1997) (footnote omitted). Although the Court must accept the plaintiffs' factual allegations as true, conclusory allegations are not entitled to an assumption of truth, and even those allegations pleaded with factual support need only be accepted to the extent that "they plausibly give rise to an entitlement to relief." <u>Iqbal</u>, __ U.S. at __, 129 S. Ct. at 1950. Furthermore, where "more likely explanations" than those alleged by the plaintiff exist, the Court should be reluctant to find that the plaintiff's allegations have sufficiently nudged his claims into the realm of plausibility. <u>See id.</u> at 1951-52. If "the [C]ourt finds that the plaintiffs have failed to allege all the material elements of their cause of action," then the Court may dismiss the complaint without prejudice, <u>Taylor v. FDIC</u>, 132 F.3d 753, 761 (D.C. Cir. 1997), or with prejudice, provided that the Court "determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency," <u>Firestone v. Firestone</u>, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation marks and citations omitted).

**C.      Motion for Summary Judgment Under Federal Rule of Civil Procedure 56**

Courts will grant a motion for summary judgment if "the pleadings, depositions, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c). When ruling on a motion for summary judgment, courts must view the evidence in the light most favorable to the nonmoving party. Bayer v. U.S. Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992). The nonmoving party, however, cannot rely on "mere allegations or denials . . . , but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation and internal quotation marks omitted). Under Rule 56, "if a party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial," summary judgment is warranted. Hazward v. Runyon, 14 F. Supp. 2d 120, 122 (D.D.C. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of establishing the absence of evidence that supports the non-moving party's case. Id. In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000) (citations omitted).

### III. LEGAL ANALYSIS

**A.** **The Claims Against The United States**

The United States moves to dismiss the plaintiff's six FTCA claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). See generally United States Mot. at 8-20. For the reasons explained below, Counts One, Three, Four, and Five will be dismissed for lack of subject matter jurisdiction, part of Count Six will also be dismissed for lack of subject matter jurisdiction and the remainder of this Count will be dismissed for failure to state a claim, and the United States' motion to dismiss Count Two will be denied.

1.      Counts One, Four, Five, and Six of the United States Complaint

The United States argues that the plaintiff's false arrest and imprisonment claim associated with his March 2003 arrest (Count One), the intentional infliction of emotional distress claim (Count Four), the conversion of property claim (Count Five), and the loss of future earnings, humiliation and damage to reputation claim (Count Six) should be dismissed for lack of subject matter jurisdiction because these claims are time-barred.  See United States Mot. at 8-9.  More specifically, the United States contends that because these Counts arise out of events that occurred between March 6 and 10, 2003, in accordance with the FTCA's two-year limitations, they had to be presented in writing to the appropriate federal agency by March 10, 2005.  See id. at 7-10.  However the United States represents that the Capitol Police, the appropriate federal agency for most of the claims asserted by the plaintiff, did not receive the plaintiff's administrative claim until March 17, 2005, approximately one week after the limitations period expired.  See id., Ex. 1 (Decl. of Cecelia E. Barrios) ¶ 4; id., Ex. 4 (Decl. of William H. Emory) ¶ 3.

For his part, the plaintiff asserts that his administrative claim was mailed on February 25, 2005, from the District of Columbia offices of his attorneys to the address listed for the Capitol Police, which was in accordance with instructions provided by that agency's General Counsel's Office.  Pl.'s Opp'n to United States Mot. at 14-15; id., Ex. 1 (Decl. of Lory C. Stone), Ex. A (Instructions for Filing a Tort Claim with the United States Capitol Police).  Unbeknownst to the plaintiff, however, because this address has the same zip code as the United States Senate, his administrative claim was subject to various mail screening procedures, resulting in the delivery of his administrative claim being delayed.  Pl.'s Opp'n to United States Mot. at 14-15; id., Ex. 1

(Decl. of Lory C. Stone) ¶¶ 5-9.[14]  The plaintiff therefore argues that a presumption of mailing satisfies the presentment requirement of the FTCA, Pl.'s Opp'n to United States Mot. at 15-16, that the evidence is insufficient to show when his claim was actually received, id. at 17-19,[15] that his claim was timely received by the Senate Post Office, which should be deemed an agent of the Capitol Police, id. at 19-20, and finally that the limitations period should be equitably tolled in light of the unforeseen delays in the processing of mail, id. at 21-26.

It is well settled that the United States is immune from suit unless Congress has expressly provided consent to be sued; that is, when Congress has waived the United States' sovereign immunity.  E.g., FDIC v. Meyer, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.  Sovereign immunity is jurisdictional in nature." (internal citations omitted)).  "The FTCA operates as a limited waiver of sovereign immunity, rendering the United States amenable to suit for certain, but not all, tort claims."  Rashad v. D.C. Central Detention Facility, 570 F. Supp. 2d 20, 23 (D.D.C. 2008) (citing Richards v. United States, 369 U.S. 1, 6 (1962)).

The date the plaintiff's administrative claim was received is important because a party asserting jurisdiction under the FTCA must satisfy administrative exhaustion requirements by "present[ing] the claim to the appropriate federal agency."  28 U.S.C. § 2675(a); see McNeil v.

---

[14]  The address where the plaintiff mailed his claim is 119 D Street NE, Washington, D.C. 20510-7218.  Pl.'s Opp'n to United States Mot. at 10.  During the relevant time period, mail sent to this zip code was initially sent to an off-site facility for irradiation, then directed back to the Senate Post Office before finally being delivered to the Capitol Police offices, a process which typically took between 7 to 10 days from placement of a letter in the mail to delivery by the Senate Post Office.  See id., Ex. 2 (Stipulation of Facts Regarding Processing of Mail by the United States Senate Post Office) ¶¶ 2-5.  News accounts also reported that mail delivery on Capitol Hill was slowed in the middle of March, 2005, due to the anthrax scare.  See Jennifer Yachnin, Hill Mail Still On Schedule Despite USPS' V St. Closure, Roll Call (Mar. 16, 2005), available at 2005 WLNR 4061197.

[15]  In this regard, the plaintiff points out that the United States has provided neither a copy of the stamped administrative claim form, nor the actual envelope in which the plaintiff's claim was mailed.  Pl.'s Opp'n to United States Mot. at 17-18.  An organizational representative from the Capitol Police stated in a deposition that it was generally the practice to retain envelopes in the claim file, but that was not done in this case.  See id. at 18 n.11.

United States, 508 U.S. 106, 113 (1993).  In fact, the United States Code makes clear that a "tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues," 28 U.S.C. § 2401(b), and the associated regulations explain that a claim is deemed presented when it is received by the agency, 28 C.F.R. § 14.2(a) (2005); id. § 14.2(b)(1).[16]  Under the FTCA, a claim accrues "by the time a plaintiff 'has discovered both his injury and its cause.'" Sexton v. United States, 832 F.2d 629, 633 (D.C. Cir. 1987) (quoting United States v. Kubrick, 444 U.S. 111, 120 (1979)).  If the plaintiff does not meet the presentment of claim requirements of 28 U.S.C. §§ 2401(b) and 2675(a), the Court lacks jurisdiction to entertain the claim.  Stokes v. United States Postal Serv., 937 F. Supp. 11, 14 (D.D.C. 1996) (citing Jackson v. United States, 730 F.2d 808, 809 (D.C. Cir. 1984)).

        In this case, however, the Court need not resolve whether the plaintiff's claim was timely presented to the Capitol Police or whether equitable tolling applies to the FTCA's statute of limitations.  Norman v. United States, 467 F.3d 773, 776 (D.C. Cir. 2006) (declining to decide whether equitable tolling applies to the FTCA).  These determinations are unnecessary because even if the administrative claim was timely presented, the Court concludes that the plaintiff's related judicial claims would still have to be dismissed for lack of subject matter jurisdiction due to the fact that they fall within the FTCA exemptions of 28 U.S.C. § 2680, and are therefore barred by sovereign immunity.  Edmonds v. United States, 436 F. Supp. 2d 28, 35 (D.D.C. 2006)

---

[16]  For the most part, the circuit courts that have considered whether claims have been timely presented under the FTCA have concluded that a claim is presented when the federal agency is in actual receipt of the claim.  E.g., Lightfoot v. United States, 564 F.3d 625, 628 (3rd Cir. 2009) (collecting cases and holding that a plaintiff must demonstrate that the federal agency was in actual receipt of the claim); Drazan v. United States, 762 F.2d 56, 58 (7th Cir. 1985) ("[T]he district court was quite right to hold that mailing is not presenting; there must be receipt."); but see Barnett v. Okeechobee Hosp., 283 F.3d 1232, 1240 (11th Cir. 2002) (holding that proof of mailing gave rise to a presumption of receipt, similar to the common law mailbox rule).

(citing <u>Sloan v. United States Dep't of Housing & Urban Dev.</u>, 236 F.3d 756, 759 (D.C. Cir. 2001)); <u>cf.</u> <u>NetworkIP, LLC v. FCC</u>, 548 F.3d 116, 120 (D.C. Cir. 2008) ("It is axiomatic that subject matter jurisdiction may not be waived, and that courts may raise the issue <u>sua</u> <u>sponte</u>." (citation omitted)).

To begin with, the plaintiff's detention and false arrest claim (Count One) fails because it is barred by the discretionary function exemption to the FTCA. <u>See</u> 28 U.S.C. § 2680(a). In relevant part, that provision shields the United States from liability from "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." <u>Id.</u> This exemption "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals," <u>Shuler v. United States</u>, 531 F.3d 930, 933 (D.C. Cir. 2008) (quoting <u>United States v. Varig Airlines</u>, 467 U.S. 797, 808 (1984)), and its purpose is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," <u>United States v. Gaubert</u>, 499 U.S. 315, 323 (1991) (quoting <u>Varig Airlines</u>, 467 U.S. at 814).

The Supreme Court has established a two-part test to determine whether the conduct alleged by the plaintiff falls under the discretionary function exemption. <u>See id.</u> at 322-23. First, the act at issue must "involv[e] an element of judgment or choice," meaning that no federal statute, regulation, or policy specifically prescribes a course of action for the employee to follow. <u>See</u> <u>Sloan</u>, 236 F.3d at 759 (quoting <u>Gaubert</u>, 499 U.S. at 322). Second, assuming that an element of judgment is involved, it must be determined whether the judgment is of a kind that

the discretionary function exception is designed to protect, notably, "governmental actions and decisions based on considerations of public policy." Id. at 760 (quoting Gaubert, 499 U.S. at 323). If the discretionary function exemption applies, the United States is immune from suit and the Court lacks subject matter jurisdiction over the claim. Id. at 759; see Cope v. Scott, 45 F.3d 445, 448 (D.C. Cir. 1995) ("Discretionary function determinations are jurisdictional in nature.").

In this case, the decision to detain and then arrest the plaintiff in the Capitol Building falls well within the scope of the discretionary function. Capitol Police officers are empowered by federal law "to make arrests within the United States Capitol Buildings . . . for any violations of any law of the United States," 2 U.S.C. § 1961(a) (2006), and based on his appearance that day, the Court previously determined that it was "entirely reasonable" for the Capitol Police to believe that the plaintiff was, at a minimum, engaged in an unlawful demonstration in the Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). See Olaniyi, 416 F. Supp. 2d at 54. "Making an arrest is a discretionary function," Bailey v. United States Marshall Serv., 584 F. Supp. 2d 128, 132 (D.D.C. 2008), and "[d]ecisions regarding the timing of arrests are the kind of discretionary government decisions, rife with considerations of public policy, that Congress did not want the judiciary 'second guessing.'" Schuler, 531 F.3d at 934 (quoting Varig Airlines, 467 U.S. at 814); see Deuser v. Vecera, 139 F.3d 1190, 1195 (8th Cir. 1998) ("Law enforcement decisions of the kind involved in making or terminating an arrest must be within the discretion and judgment of enforcing officers."). Accordingly, the detention and false arrest components of Count One of the Complaint is barred by the discretionary function exemption of the FTCA.

As to the conversion of property claim (Count Five), the Court concludes that this claim fails based on 28 U.S.C. § 2680(c), which exempts the United States from liability for "[a]ny claim arising in respect of . . . the detention of any goods, merchandise, or other property by any

officer or customs or excise or any other law enforcement officer." Id. The Supreme Court has interpreted this exemption broadly, explaining that it includes claims "resulting from the negligent handling or storage of detained property," Kosak v. United States, 465 U.S. 848, 854 (1984), and recently held that the phrase "any other law enforcement officer" includes "law enforcement officers of whatever kind," Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 220 (2008). Although the Supreme Court did not delineate what constitutes "detention" in this context, id. at 218 n.2, the Sixth Circuit has observed that "[a] detention is generally associated with a period of temporary custody or delay. . . . It is a term often associated with an ongoing investigation." Kurinsky v. United States, 33 F.3d 594, 597 (6th Cir. 1994); see Chapa v. United States Dep't of Justice, 339 F.3d 388, 390-91 (5th Cir. 2003) (agreeing with this interpretation of detention). Indeed, in the legal sense of the word, detention consists of "[t]he act or fact of holding a person [or property] in custody," Black's Law Dictionary 514 (9th ed. 2004), and "custody," in turn, is "[t]he care and control of a thing or person for inspection, preservation, or security," id. at 441.

Applying that understanding of "detention" here, the Court concludes that 28 U.S.C. § 2680(c) encompasses the plaintiff's conversion of property claim. At the point in time when the bomb technicians entered the van, the plaintiff and Patel were in custody, and the keys to the van were in the possession of the Capitol Police and the FBI, who were actively investigating whether the vehicle was connected to the plaintiff's presence at the Capitol Building. In the course of this investigation, the street where the van was parked was closed to pedestrian and vehicle traffic, and access to the van was limited to law enforcement officers and bomb technicians, who exercised control over the van in order to inspect it for hazards and secure the scene. In that sense, the van was in temporary custody of law enforcement officials and,

therefore, under detention for purposes of 28 U.S.C. § 2680(c). Accordingly, the Court lacks

subject matter jurisdiction over the plaintiff's conversion claim.[17]

With respect to Count Six, it fails because the United States has not waived its sovereign

immunity for claims "arising out of" alleged acts of libel or slander. 28 U.S.C. § 2680(h).

Although this Count is styled as one for loss of future earnings, humiliation, and damage to

reputation, United States Compl. ¶¶ 68-72, the "label which a plaintiff applies to a pleading does

not determine the nature of the cause of action which he states," Edmonds, 436 F. Supp. 2d at 35

(quoting Johnson v. United States, 547 F.2d 688, 691 (D.C. Cir. 1976)). Instead, the Court must

scrutinize the alleged cause of the plaintiff's injury in assessing the nature of his claim. Kugel v.

United States, 947 F.2d 1504, 1507 (D.C. Cir. 1991).

Kugel is illustrative in this regard. The plaintiff in Kugel alleged that the FBI conducted

an investigation into his business practices and, even though he was later exonerated, he was

injured when reports of the investigation appeared in the media. See id. at 1506. The plaintiff

brought suit under the FTCA claiming that several municipalities canceled their contracts or

refused to do business with him, that he was forced to file for bankruptcy, and that he suffered

public ridicule and humiliation resulting from the cancellations. Id. The District of Columbia

Circuit examined the nature of the claims and determined that the cause of the injury was not the

FBI investigation, but was instead the "dissemination of information associated with the

---

[17] The Court does not consider how the conversion claim might apply to the FBI inventory search because the plaintiff does not seek to impose liability on the FBI under the FTCA for that action. Pl.'s Opp'n to United States Mot. at 10 n.4. In fact, any claim against the FBI under the FTCA appears to be time-barred because the plaintiff failed to institute a civil action against it within six months "after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b). Here, the FBI denied the plaintiff's administrative claim on October 25, 2005, United States Mot., Ex. 2 (Decl. of Sophia Marta Ivashkiv) ¶ 2, and therefore the plaintiff was required to bring this action in April of 2006 to maintain a claim against the FBI. However, this action was not initiated until December of 2006, well after the six month limitation period had expired.

investigation." Id. at 1507.  The Circuit thus concluded that the plaintiff's claim sounded in defamation and was therefore barred under 28 U.S.C. § 2680(h).  Id.

The same rationale applies here.  Upon scrutinizing the alleged cause of his injury, it becomes clear that Count Six is essentially a defamation claim.  In particular, the plaintiff alleges that because of his arrest, his supporters withdrew funding from future productions of his play, resulting in humiliation and damage to his reputation, and that some of his "best patrons stopped purchasing [his] artwork."  See United States Compl.  ¶¶ 70-72.  Significantly, the complaint states that "[n]umerous newspapers…ran articles covering the arrest.  As a result, many of [the plaintiff's] supporters withdrew their support for 'David/Dafidi' after the arrest because they did not want to be associated with a 'terrorist.'"  Id. ¶ 71.  Thus, the alleged harm did not result from the arrest, but rather the dissemination of information about the arrest which purportedly harmed the plaintiff's reputation in the eyes of third parties.  Such a claim "resound[s] in the heartland of the tort of defamation," Jimenez-Nieves v. United States, 682 F.2d 1, 6 (1st Cir. 1982), and is therefore barred under 28 U.S.C. § 2680(h).  Kugel, 947 F.2d at 1507; Edmonds, 436 F. Supp. 2d at 36-37; see Wuterich v. Murtha, 562 F.3d 375, 387 (D.C. Cir. 2009) (instructing district court to dismiss plaintiff's defamation suit against the United States because it is barred by 28 U.S.C. § 2680(h)).

The claim for intentional infliction of emotional distress (Count Four) is somewhat more difficult to resolve because it is based on four different events:  (1) the plaintiff's arrest in the Capitol Building; (2) Detective DePalma's purported actions during the traffic stop in January 2004; (3) ongoing harassment and intimidation allegedly committed by Detective DePalma and other members of the federal government; and (4) Secret Service Agent Hull's alleged threat to confiscate the plaintiff's immigration papers.  See United States Compl. ¶¶ 57-61.  The last three

of these events are obviously timely, each having occurred within two years of March 17, 2005, the date the United States acknowledges receiving the plaintiff's administrative claim. United States Mot. at 10.

To the extent that this Count concerns the arrest by the Capitol Police officers, even though 28 U.S.C. § 2680(h) waives the United States' sovereign immunity for certain intentional torts committed by law enforcement officers, "claims of intentional torts under § 2680(h) must clear the § 2680(a) discretionary function hurdle." Medina v. United States, 259 F.3d 220, 226 (4th Cir. 2001); Gray v. Bell, 712 F.2d 490, 508 (D.C. Cir. 1983). Because the Court has already found that the decision to arrest the plaintiff fell under the discretionary function exemption, insofar as this Count is brought against the Capitol Police for their conduct in arresting the plaintiff, the Court lacks subject matter jurisdiction to consider it. That component of the claim must therefore be dismissed, and the remaining components of the claim will be addressed later in this opinion.

      2.    <u>Count Three of the United States Complaint</u>

Count Three of the United States Complaint contends that the Capitol Police and the FBI "maliciously [instituted] proceedings against [the plaintiff] by detaining and arresting him, and by initiating proceedings against him despite having determined on the scene that [he] possessed no explosives and that there was insufficient evidence to sustain [the] charges." United States Comp. ¶ 52. The United States argues that the plaintiff's malicious prosecution claim is also barred by the discretionary function exception of the FTCA because the plaintiff is essentially challenging the government's decision to prosecute him. See United States Mot. at 10-13.

The plaintiff concedes that the discretionary function exception of the FTCA generally prohibits malicious prosecution claims brought against prosecutors, Pl.'s Opp'n to United States

Mot. at 29, but argues that the exception should not apply to the Capitol Police in this case because malicious prosecution claims against law enforcement officers are expressly allowed under a different provision of the FTCA, namely, 28 U.S.C. 2680(h), id. at 29-30. The Court does not agree.

As noted in connection with the plaintiff's intentional infliction of emotional distress claim, the District of Columbia Circuit has made it clear that "the plain language of 28 U.S.C. § 2680(a) states that the FTCA's general waiver of sovereign immunity is inapplicable to 'any claim' based on a discretionary function." Gray, 712 F.2d at 507. Consequently, a plaintiff "must clear the discretionary function hurdle" in order to sustain a malicious prosecution claim. Id. at 508 (internal quotations omitted); see Medina, 259 F.3d at 226. Because prosecutorial decisions "as to whether, when, and against whom to initiate prosecution are quintessential examples of governmental discretion," Gray, 712 F.2d at 513, this Court has previously concluded that a "decision to prosecute . . . generally having been the byproduct of an investigation, logically calls for the investigation itself also being treated as a discretionary function." Gustave-Schmidt v. Chao, 226 F. Supp. 2d 191, 199 (D.D.C. 2002) (Walton, J.); see Bragdon v. United States, 537 F. Supp. 2d 157, 159-60 (D.D.C. 2008) (determining that a negligent investigation claim brought against an FBI agent was barred by the discretionary function exemption); Wright v. United States, 963 F. Supp. 7, 17 (D.D.C. 1997) ("If the function of identifying what evidence to submit to a judicial tribunal is discretionary for prosecutors . . . it should be similarly discretionary for police officers.").

Here, the acts forming the basis for Count Three are the arrest of the plaintiff in the Capitol Building and the decision by the Capitol Police to continue his detention despite having determined that he did not possess any explosives or other hazardous materials. United States

Compl. ¶ 52.  The Court cannot grasp a meaningful way in which the acts of the Capitol Police can be considered separate and apart from the decision of whether to prosecute, as there likely would have been no prosecution had there been no arrest.  And where conduct "during an investigation is 'inextricably tied' to the overall discretionary decision to investigate and then prosecute a plaintiff, such actions are included within the discretionary function exemption to FTCA jurisdiction."  Tabman v. F.B.I., 718 F. Supp. 2d 98, 105 (D.D.C. 2010) (quoting Gustave-Schmidt, 226 F. Supp. 2d at 199).  That being the situation here, even if the Capitol Police acted in an "improper, tortious, [or] constitutionally defective manner" in conducting the investigation, their actions nonetheless fall within the discretionary function exemption.  Gustave-Schmidt, 226 F. Supp 2d at 199 (citing Gray v. Bell, 712 F.2d at 515-16); see also Shuler, 531 F.3d at 935 ("[T]he discretionary function immunizes even government abuses of discretion.").  Accordingly, the plaintiff's malicious prosecution claim is dismissed for lack of subject matter jurisdiction.

       3.      Count Two of the United States Complaint

The United States moves to dismiss the plaintiff's false arrest and imprisonment claim based on the January 2004 vehicle stop for failure to state a claim upon which relief may be granted.  United States Mot. at 14-16.  In its opening motion, the United States does not attempt to justify the initial traffic stop, but claims that Detective DePalma, who arrived after the stop, was aware of the plaintiff's child custody dispute with his ex-wife and on that basis had probable cause to question the plaintiff about the custody status of the children.  Id. at 15.[18]  In opposition,

---

[18]  In its reply brief, the United States asserts that there was reasonable suspicion to stop the plaintiff based on his van's dirty out of state license plates, snow on the van, and because the plaintiff was driving near the Capitol Building on January 20, 2004, when heightened security measures were in place for the President's State of the Union Address.  United States Reply at 16; id., Ex. 6 (Decl. of Joseph DePalma).  The United States then claims that the events that transpired during the course of the traffic stop did not violate the Fourth Amendment.  See id. at 15-

(continued . . .)

the plaintiff contends that there was no probable cause to stop his van and maintains that he has stated a claim for false arrest because the stop was unlawfully prolonged by Detective DePalma's questions and the canine search. See Pl.'s Opp'n to United States Mot. at 35-37. Specifically, the plaintiff claims he was stopped by the Capitol Police while driving near the Capitol Building, United States Compl. ¶ 34, and was told that the stop was made because "there was snow on the van and because the Michigan tags made them 'suspicious.'" Id. ¶ 35. The plaintiff then alleges that Detective DePalma, who did not make the initial stop, subsequently arrived on the scene and seemed to be supervising the activities. Id. During the stop, Detective DePalma allegedly "ordered [the plaintiff] out of the van, and asked [him] questions about why he was back in the District of Columbia, . . . asked about [the plaintiff's] custody status of his children and made other intimidating remarks [and] had dogs search [the] van while [the] children remained in it." Id. ¶ 48. As a result, the plaintiff maintains that his "movement was limited to a fixed area near Detective DePalma, whose words and conduct limited [the plaintiff's] free movement." Id.

The Court finds that Count Two adequately states a claim for false arrest. To support a claim of false arrest under District of Columbia law,[19] the plaintiff must allege that he was unlawfully detained. Dingle v. District of Columbia, 571 F. Supp. 2d 87, 95 (D.D.C. 2008) (citing Dent v. May Dep't Stores Co., 459 A.2d 1042, 1044 (D.C. 1982) ("The gist of any complaint for false arrest or false imprisonment is an unlawful detention . . . ." (internal quotations omitted)). Being unlawfully detained for "any amount of time" is sufficient to make out a claim for false arrest or false imprisonment. Marshall v. District of Columbia, 391 A.2d

(. . . continued)
18. However arguments raised for the first time in reply briefs are deemed waived, e.g., Penn. Elec. Co. v. FERC, 11 F.3d 207, 209 (D.C. Cir. 1993), and the Court will not consider the impact of this argument at this time.

[19] District of Columbia substantive law applies because the events giving rise to the complaint occurred in this jurisdiction. 28 U.S.C. § 1346(b)(1); Thomas v. Nicholson, 539 F. Supp. 2d 205, 214 n.6 (D.D.C. 2008).

1374, 1380 (D.C. 1978). Here, the United States does not claim in its motion that the plaintiff was pulled over for committing a traffic violation. In any event, the fact that the plaintiff's van had out-of-state license plates and uncleared snow on it are not enough, standing alone, for the Court to find probable cause to stop the van.[20] It is also implausible that the plaintiff's involvement in a custody dispute can provide a basis for the <u>initial</u> stop, because on the facts of this case the identity of the driver and the existence of the custody dispute would only become apparent after the van was pulled over.

Even if the Court determined that there was reasonable suspicion to justify the initial stop, the plaintiff has alleged a number of events that transpired <u>after</u> this occurred, namely, Detective DePalma's arrival on the scene, the questioning by Detective DePalma, and the canine search as grounds supporting Count Three. United States Compl. ¶ 48.[21] The Court recognizes that police officers may conduct brief investigative stops provided they have "reasonable, articulable suspicion" that criminal activity is afoot, <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000) (citing <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968)), and that in the automobile context the police may lawfully inquire into matters unrelated to the justification for the stop so long as those inquiries do not measurably extend the duration of the encounter. <u>E.g.</u>, <u>Arizona v. Johnson</u>, __ U.S. __, __, 129 S. Ct. 781, 788 (2009); <u>see also</u> <u>Illinois v. Caballes</u>, 543 U.S. 405, 407 (2005) ("[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."). Nonetheless,

---

[20] The Court notes that there may have been articulable suspicion to stop the plaintiff if the officer recognized the plaintiff before he was pulled over, but that is not alleged here. Moreover, in the District of Columbia having an illegible or obstructed license plate is a moving infraction with an associated $50.00 fine. D.C. Mun. Regs. tit. 18, § 2600 (2010). But again, this is not asserted as the reason the plaintiff's van was stopped.

[21] The Court also notes that the parties dispute the scope and circumstances of the canine search, with the plaintiff representing that it extended to the <u>interior</u> of his van while the children were in it, Pl.'s Opp'n to United States Mot. at 36-37, and Detective DePalma claiming that the plaintiff consented to the search, United States Reply, Ex. 6 (Decl. of Joseph DePalma) at 2.

whether a traffic stop has been unlawfully extended is usually a fact-specific inquiry, United States v. Hutchinson, 408 F.3d 796, 799 (D.C. Cir. 2005), which requires an examination of "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." United States v. Vinton, 594 F.3d 14, 24 (D.C. Cir. 2010) (quoting United States v. Sharpe, 470 U.S. 675, 685-86 (1985)).

The factual record in this case may ultimately clarify the circumstances surrounding the January 2004 stop of the plaintiff's van, such as the reason the plaintiff's van was pulled over, the duration of the encounter, and the scope of the canine search. To survive a motion to dismiss, however, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, __ U.S. at __, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570). Applying that minimal standard of review here, the Court concludes that the plaintiff has adequately alleged that he was falsely imprisoned during the vehicle stop in January 2004. Accordingly, the United States' motion to dismiss Count Two for failure to state a claim is denied.

        4.       Count Four of the United States Complaint

The remaining components of the plaintiff's intentional infliction of emotional distress claim that remain alive are based on Detective DePalma's purported actions during the vehicle stop in January 2004, the alleged ongoing harassment of the plaintiff by members of the federal government, and the statement allegedly made by Secret Service Agent Hull threatening to have the plaintiff deported "for no legal reason." See United States Compl. ¶¶ 58-61. The United States has also moved to dismiss this Count of the complaint for failure to state a claim upon which relief can be granted, contending that none of the allegations rise to the level of legally actionable conduct. United States Mot. at 19. The plaintiff responds that the "year-long

campaign of harassment and psychological warfare" engaged in by these defendants is sufficiently extreme and outrageous to support this claim. Pl.'s Opp'n to United States at 38-40.

Under District of Columbia law, a claim of intentional infliction of emotional distress requires that the plaintiff show "(1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress." Kassem v. Wash. Hosp. Ctr., 513 F.3d 251, 255 (D.C. Cir. 2008) (quoting Larijani v. Georgetown Univ., 791 A.2d 41, 44 (D.C. 2002)). As the District of Columbia Circuit has explained, "a case of intentional infliction of emotional distress is made out only if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" Larijani, 791 A.2d at 44 (quoting Restatement (Second) of Torts § 46 (1965)); see Sere v. Group Hospitalization, Inc., 443 A.2d 33, 37 (D.C. 1982) (explaining that liability will be found where the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.") (quoting Restatement (Second) of Torts § 46 cmt. 73 (1965)). This standard "is not an easy one to meet," Drejzo v. Vaccaro, 650 A.2d 1308, 1312 (D.C. 1994), and "[l]iability will not be imposed for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," District of Columbia v. Tulin, 994 A.2d 788, 800 (D.C. 2010) (quoting Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998)).

Here, the Court concludes that none of the plaintiff's allegations asserted in support of Count Four state a claim for intentional infliction of emotional distress. To begin with, having a police officer inquire about the custody status of children he knows have been the subject of a custody dispute during the course of a vehicle stop is just not the type of behavior that would cause an average member of the District of Columbia community to exclaim "Outrageous!"

Larijani, 791 A.2d at 44. This is especially so in the circumstances of this case, given the plaintiff's admission that Detective DePalma was aware of the plaintiff's divorce and child custody proceedings. United States Compl. ¶ 36. Even if Detective DePalma's statements could be construed as demeaning, it is clear that "insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to support a claim for intentional infliction of emotional distress under District of Columbia law. Tulin, 994 A.2d at 801.

The complaint also fails to state a claim for intentional infliction of emotional distress for events arising out of the alleged pattern of harassment and the investigation by the Secret Service agents. The plaintiff admits that the investigation commenced after his ex-wife apparently contacted authorities in Michigan and reported that the plaintiff was going to kill the President. United States Compl. ¶ 40. Given the gravity of this allegation, the investigation and questioning by the Secret Service, including the associated threat allegedly made by Agent Hull's to have the plaintiff deported, was not so unreasonable to be considered extreme or dangerous. Cf. United States v. Kosma, 951 F.2d 549, 557 (3rd Cir. 1991) ("[A] threat [against the President] sets in motion an entire army of Secret Service agents and law enforcement officials who must investigate the threat, take additional safety precautions to protect the President, and extreme cases, alter the President's schedule."); see also United States v. Cvijanovich, 556 F.3d 857, 861 (8th Cir. 2009) (noting testimony from Secret Service agent that all threats are taken seriously, describing the investigative procedures employed after a threat is made, and explaining that an investigation ends when the agents are satisfied there is no threat), but in any event, surely cannot be considered extreme or outrageous.

The role of the plaintiff's ex-wife in reporting the threat explains why members of the federal government were purportedly harassing the plaintiff and were in "communications" with

her.  United States Compl. ¶¶ 59-60.  Even if the threat was completely baseless, neither the

follow-up investigation by the Secret Service nor the fact that the prosecutors were in contact

with the plaintiff's ex-wife is "so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized community."  Tulin, 994 A.2d at 800 (quoting Larijani, 791 A.2d at 44).  And this is

so even regarding the alleged threat to have the plaintiff deported, which if made may have been

improper.  Accordingly, the plaintiff's claim for intentional infliction of emotional distress is

dismissed for failure to state a claim upon which relief can be granted.

**B.**      **The Claims Against the District of Columbia**

The plaintiff seeks to impose liability on the District of Columbia pursuant to 42 U.S.C. §

1983 for events that that allegedly transpired during his confinement in the Mental Health Unit.

Am. Compl. ¶¶ 107-111.[22]  For the following reasons, the Court concludes that the plaintiff has

adequately stated a claim for a violation of 42 U.S.C. § 1983, and that summary judgment is

premature at this point given the limited discovery that has occurred.

---

[22]  The plaintiff also brought several tort claims against the District of Columbia, see Am. Compl. ¶¶ 112-122, and
requested that punitive damages be awarded, id. ¶ 124.  As to the motion to dismiss the tort claims, the plaintiff's
opposition states that he has "reviewed arguments of the District of Columbia with respect to" these tort claims and
"will voluntarily dismiss" them.  Pl.'s Opp'n to District of Columbia Mot. at 1 n.1.  However, four months before
the plaintiff filed this opposition, the District of Columbia filed an Answer, Docket Entry 97, and pursuant to
Federal Rule of Civil Procedure 41(a), the plaintiff is prohibited from voluntarily dismissing these counts except
with leave of the Court, Fed. R. Civ. P. 41(a)(2), or by filing a signed stipulation of dismissal "by all parties who
have appeared," Fed. R. Civ. P. 41(a)(1)(A)(ii).  The plaintiff has not sought such leave of the Court and no signed
stipulation by the parties has been filed.  Nevertheless, the Court finds that it is in the interest of justice to grant
plaintiff leave to voluntarily dismiss these claims and will therefore sua sponte grant the plaintiff leave to do so.
With respect to his punitive damages request, the plaintiff's opposition fails to address the District of Columbia's
argument that punitive damages are inappropriate in this case, District of Columbia Mot. at 27-29, and therefore the
issue is deemed conceded.  Hopkins v. Women's Div., General Bd. of Global Ministries, 284 F. Supp. 2d 15, 25
(D.D.C. 2003).

1. <u>The Complaint Adequately States a Claim for a Violation of 42 U.S.C. § 1983</u>

The District of Columbia has moved to dismiss the plaintiff's § 1983 claim, asserting, among other things, that there is no <u>respondeat</u> <u>superior</u> liability under § 1983, that the complaint does not point to a formal or informal policy of the District of Columbia that caused the plaintiff's injury, and that no custom or policy was the moving force behind the alleged constitutional wrongs inflicted on the plaintiff. <u>See</u> District of Columbia Mot. at 14.[23]

"In order to hold a municipality liable for civil rights violations of its employees under 42 U.S.C. § 1983, the municipality must have acted in accordance with a 'government policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" <u>Sanders v. District of Columbia</u>, 522 F. Supp. 2d 83, 87-88 (D.D.C. 2007) (quoting <u>Monell v. Dep't of Social Servs. of City of New York</u>, 436 U.S. 658, 694 (1978)); <u>see</u> <u>Fierson v. District of Columbia</u>, 506 F.3d 1063, 1066 (D.C. Cir. 2007) ("[T]o impose liability on the District under 42 U.S.C. § 1983, [the plaintiff] must show not only a violation of his rights under the Constitution or federal law, but also that the [District's] custom or policy caused the violation." (quoting <u>Warren v. District of Columbia</u>, 353 F.3d 36, 38 (D.C. Cir. 2004))). "<u>Respondeat</u> <u>superior</u>, or vicarious liability, will not attach under § 1983, and therefore a municipality cannot be held liable solely because it employs a tortfeasor." <u>Burnett v.</u>

---

[23] The District of Columbia also argues that it cannot be found liable because the personnel at the jail were independent contractors. District of Columbia Mot. at 9-11. However, as the plaintiff correctly points out, Pl.'s Opp'n to District of Columbia Mot. at 9-12, for purposes of § 1983 the personnel at the Mental Health Unit of the D.C. Jail who treated him can be found to have been acting under color of state law because they were performing a municipal function under authority granted by a contract with the District of Columbia, <u>West v. Atkins</u>, 487 U.S. 42, 54-55 (1988). The District of Columbia is constitutionally obligated to provide inmates with medical care, <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976), and pursuant to the authority granted by D.C. Code § 24-211.02 (2001), the District of Columbia Department of Corrections contracted with the Center for Correctional and Health Policy Studies ("CCHPS") to provide medical services to inmates of the D.C. Jail. District of Columbia Mot., Ex. B (Contract between the District of Columbia and CCHPS). As such, the CCHPS employees at the Mental Health Unit were performing a municipal function, in a municipal facility, under authority granted to them by municipal law. Accordingly, the District cannot avoid liability merely because the plaintiff's alleged injury occurred at the hands of a third party contracted to perform the services he claims caused him injury.

Sharma, 511 F. Supp. 2d 136, 141 (D.D.C. 2007) (internal quotation marks and citations omitted). Accordingly, to survive a motion to dismiss, a complaint asserting a § 1983 claim must allege a predicate constitutional violation which was caused by a policy of the District of Columbia. See Muhammad v. District of Columbia, 584 F. Supp. 2d 134, 138 (D.D.C. 2008) (quoting Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

In this case, the plaintiff has adequately pled a predicate constitutional violation arising from the alleged forcible administration of antipsychotic medication, Am. Compl. ¶¶ 75, 108, which if proven at trial would constitute a violation of the due process clause of the Fifth Amendment. See United States v. Weston, 134 F. Supp. 2d 115, 120 (D.D.C. 2001) (Sullivan, J.) (citing Riggins v. Nevada, 504 U.S. 127, 133-35 (1992)). The next question then becomes whether the complaint alleges an affirmative link such that a custom or policy of the District of Columbia was the moving force behind this alleged violation. Baker, 326 F.3d at 1306.

There are a number of ways in which a "policy" can be created by a municipality resulting in its liability under § 1983. Id. One way this can occur is from the government's failure "to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." Id.; see also Daskalea v. District of Columbia, 227 F.3d 433, 441 (D.C. Cir. 2000). Deliberate indifference is determined by "analyzing whether the municipality knew or should have known of the risk of constitutional violations" and yet failed to take remedial action. Baker, 326 F.3d at 1307.

Upon reviewing the complaint, the Court concludes that it adequately alleges that a policy of the District of Columbia resulted in the constitutional violations asserted by the plaintiff. Although it speaks in general terms, the complaint alleges that the District of Columbia

designed and implemented a program at the D.C. Jail that allowed "for the use of force, including the use of anti-psychotic drugs, when disciplining inmates and pre-trial detainees," Am. Compl. ¶ 88, and that these policies "resulted in conduct in violation of the constitutional rights of the plaintiff," id. ¶ 87.  The complaint also states that the District of Columbia failed to train the personnel at the Mental Health Unit, which "resulted in a pattern or practice of excessive disciplinary measures, wrongful administration of drugs, and failure to intervene and/or punish such conduct."  Id. ¶ 92.  It further claims that the District of Columbia's policies "allowed [personnel at the jail] to hide unconstitutional or otherwise unlawful conduct without fear of appropriate discipline, reprisal or conduct," id. ¶ 89, and that the failure to document the plaintiff's injection in the Jail's medical records is indicative of these policies, id. ¶¶ 75, 90.  The complaint adds that these policies were the "moving force" behind the conduct he was subjected to, id. ¶ 91, and constituted deliberate indifference to his constitutional rights, id. ¶ 111. Although the allegations raised by the plaintiff present a close call, the Court concludes he has adequately alleged that the District of Columbia's purported policy of deliberate indifference resulted in his injuries and therefore he has "nudged [his] claim[] across the line from conceivable to plausible."  Twombly 550 U.S. at 570.  Accordingly, the District of Columbia's motion to dismiss the plaintiff's § 1983 claim for failure to state a claim must be denied.

> 2.     The District of Columbia's Motion for Summary Judgment is Premature

The District of Columbia also moves for summary judgment on the plaintiff's § 1983 claim, asserting that the medical records fail to demonstrate that he received medication of any kind while confined in the Mental Health Unit, and that the allegations in the complaint are bald assertions unsupported by factual evidence.  District of Columbia Mot. at 6, 15.  The plaintiff responds that not only are genuine factual issues in dispute, Pl.'s Opp'n to District of Columbia

Mot. at 19-23, but that the motion for summary judgment is premature on the existing record. In this regard, the plaintiff emphasizes that the record is "especially slim," and thus moves pursuant to Federal Rule of Civil Procedure 56(f) for additional discovery. Id. at 23-25; see id., Ex. G. (Decl. of Jennafer B. Neufeld) ("Neufeld Decl."). The District of Columbia apparently does not oppose the motion for additional discovery. See District of Columbia Reply.

In support of the Rule 56(f) motion, the plaintiff points to the stay of discovery ordered in this case, Docket Entry 95, and explains that the District of Columbia's responses to his interrogatories and document requests are incomplete and that the District of Columbia has failed to respond to his requests for clarification. Pl.'s Opp'n to District of Columbia Mot. at 24. As to whether any records have not been produced by the District of Columbia, it appears that the plaintiff may not have complete records concerning the events of March 7, 2003, the day the plaintiff was first committed to the Mental Health Unit, or documents concerning any treatment for diabetes he received while in the Unit prior to March 9, 2003. See id., Ex. E at 1. Moreover, no depositions of fact witnesses have been taken, id., Ex. G (Neufeld Decl.) ¶ 6, and no declarations appear to be on file. The limited scope of discovery being sought is detailed in the plaintiff's Rule 56(f) motion, id. ¶¶ 4-7, wherein he explains that the discovery he seeks will ultimately shed light on, inter alia, whether he was forcibly injected with antipsychotic drugs against his will; the District of Columbia's awareness that inmates could be injured by such conduct at the Mental Health Unit; and prior instances of any constitutional violations caused by the purported District of Columbia's policies he claims resulted in his injury. Id. ¶ 10.

While ultimately "[p]roving a failure-to-train claim is no easy task[,]" Atchinson v. District of Columbia, 73 F.3d 418, 421 (D.C. Cir. 1996) (citing to City of Canton v. Harris, 489 U.S. 378, 388-92 (1989) and City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985)), in

the context of what is alleged in this case, the Court agrees that the plaintiff could benefit from at least <u>some</u> further discovery before responding to the District of Columbia's arguments. "Summary judgment is premised on the notion that parties will have had 'adequate time for discovery' to establish whether a genuine issue of material fact exists." <u>Breen v. Peters</u>, 474 F. Supp. 2d 1, 7 (D.D.C. 2007) (quoting <u>Celotex</u>, 477 U.S. at 322). A grant of summary judgment is therefore appropriate <u>only</u> if both parties have "had a full opportunity to conduct discovery," <u>Anderson</u>, 477 U.S. at 257, and it is "the general rule that 'decision[s] by summary judgment [are] disfavored when additional development of facts might illuminate the issues of law requiring decision,'" <u>Barnes v. District of Columbia</u>, 242 F.R.D. 113, 116 (D.D.C. 2007) (citing <u>Nixon v. Freeman</u>, 670 F.2d 346, 362 (D.C. Cir. 1982)). Accordingly, the District of Columbia's motion for summary judgment is denied without prejudice at this time so that the plaintiff can conduct limited discovery into the matters identified in his opposition and Rule 56(f) motion. Once that process is complete, the District of Columbia is free to file a renewed motion for summary judgment.

## C.     <u>The Claims Against the Federal Defendants</u>

The plaintiff brings <u>Bivens</u> claims against the federal defendants alleging Fourth Amendment violations resulting from the search of his van. Am. Compl. ¶¶ 97-98. The federal defendants have moved to dismiss all of the claims, or in the alternative, seek summary judgment, asserting that the claims are barred by qualified immunity. Fed. Defs.' Mot. at 8-26.[24]

---

[24] Despite the plaintiff's claims to the contrary, Pl.'s Opp'n to Fed. Defs.' Mot. at 9-15, the federal defendants are permitted to raise the defense of qualified immunity at successive stages of the same case independently of earlier determinations because of "the importance of resolving immunity questions at the earliest possible stage of litigation." <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (per curiam). Indeed, "the legally relevant factors bearing upon the [qualified immunity] question will be different on summary judgment than on an earlier motion to dismiss," because on "summary judgment . . . the plaintiff can no longer rest on the pleadings." <u>Behrens v. Pelletier</u>, 516 U.S. 299, 309 (1996).

Because of the evidence and declarations submitted with the parties' pleadings, the Court determines the federal defendants' motion is appropriately analyzed as a motion for summary judgment under Federal Rule of Civil Procedure 56. Fed. R. Civ. Pro. 12(d); see Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d 798, 805 (D.C. Cir. 2006). For the reasons explained below, the Court concludes that because the initial search of the van was lawful, and the impoundment and inventory search were both reasonable under the circumstances, the federal defendants are entitled to qualified immunity.

1.      The General Legal Framework

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks omitted). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, __, 129 S. Ct. 808, 815 (2009). Qualified immunity is an "entitlement not to stand trial or face the other burdens of litigation" and it "is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The protection of qualified immunity "applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson, 555 U.S. at __, 129 S. Ct. at 815 (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). The "qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly

incompetent or those who knowingly violate the law.'" <u>Hunter</u>, 502 U.S. at 229 (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

Courts had been required to approach in chronological order the qualified immunity analysis through the two-step inquiry mandated in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), assessing first, whether the facts alleged show that the government official's conduct violated a "constitutional right," and then second, whether that right was "clearly established" at the time of the incident. <u>Id.</u> at 200. With respect to the second step, the "relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 202; <u>see</u> <u>Malley</u>, 475 U.S. at 341 (noting that "if officers of reasonable competence could disagree on the issue, immunity should be recognized"). This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Saucier</u>, 533 U.S. at 201. However, the Supreme Court recently announced that the "sequence set the forth" in <u>Saucier</u> "should no longer be regarded as mandatory." <u>Pearson</u>, 555 U.S at __, 129 S. Ct. at 818. Accordingly, now courts are "permitted to exercise their broad discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Id.</u> With these principles as its guidepost, the Court examines the plaintiff's allegations regarding the initial search of his van, the impoundment of the van, and the subsequent inventory search of the van.

      2.    <u>The Initial Search of the Van</u>

      a.    <u>The Defendants Not Involved in the Search of the Van</u>

At the outset, the Court notes that the plaintiff has alleged that only <u>some</u> of the thirty-seven federal defendants identified in his second amended complaint actually participated in the search of his van. Am. Compl. ¶¶ 97-98. In regards to the claims against the Capitol Police

defendants, the plaintiff alleges that defendants "Bracci, DePalma, King, and Nutwell . . . violated [his] rights by searching his van," id. ¶ 97, and further claims that defendants "DePalma, Dineen, Malloy, Meikrantz, and Udell . . . violated [his] Fourth Amendment rights by directing, supervising, participating in, and/or otherwise assisting with the search of the van." Id.

In sworn declarations, however, twenty Capitol Police officers and bomb technicians represent that while they may have been present during the events on March 6, 2003, they had no individual involvement in the actual search of the van.[25] The plaintiff has not proffered any facts to refute these representations,[26] and without evidence (or in some instances at least an allegation) of any personal involvement by the defendants listed in footnote 24 of this opinion as having been involved in the search of his vehicle, the claims against them fail because Bivens actions cannot be based on a theory of respondeat superior liability. E.g., Risley v. Hawk, 108

---

[25] The group includes the following Capitol Police defendants: (1) Jordan Bleiden; (2) Charles Boswell; (3) Tyrone Brooks; (4) Rose Cabezas; (5) Joseph DePalma; (6) Mark Crawford; (7) Gregory Guthrie; (8) Noe Gutierrez; (9) Elaine Hinkle; (10) Shawn Huycke; (11) Danny McElroy; (12) Preston Nutwell; (13) John Salb; (14) Ryan Schauf; (15) Kathleen Talbot; (16) John Shark; and (17) Mary Ann P. Turner. See generally Fed. Defs.' Mot., Ex. 2. The following defendant bomb technicians make the same representations: (1) John Dineen; (2) Daniel Malloy; and (3) Robert Meikrantz. See generally id.

[26] The plaintiff has moved pursuant to Federal Rule of Civil Procedure 56(f) for additional discovery on this matter, Pl.'s Opp'n to Fed. Defs.' Mot. at 29-30; id., Affidavit of Keith R. Wesolowski ("Wesolowski Aff."), which the federal defendants vigorously oppose. See Fed. Defs.' Reply at 24-31. Unlike the Rule 56(f) motion directed at the District of Columbia, in the qualified immunity context the Court "must exercise its discretion in a way that protects the substance of the qualified immunity defense. It must exercise its discretion so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings." Crawford-El v. Britton, 523 U.S. 574, 597-98 (1998); Behrens, 516 U.S. at 306; see Halbert Intern. Inc. v. James, 157 F.3d 1271, 1280 (11th Cir. 1998) ("In qualified immunity cases, the Rule 56(f) balancing is done with a thumb on the side of the scale weighing against discovery."). Here, the plaintiff states that he has not received discovery from the individuals named for the first time in his Second Amended Complaint, or discovery concerning the dry run theory, and he needs further information about "the events and communications depicted" on a tape recording provided to him by the Capitol Police. Pl.'s Opp'n to Fed. Defs.' Mot., Wesolowski Aff. ¶¶ 8-10. Because of this insufficient opportunity to conduct discovery, the plaintiff contends that he has not been able to "assess the veracity of the Federal Defendants' allegations." Id. ¶ 11. However the plaintiff does not account for the impact of the declarations or the records associated with the FBI inventory search, and does not articulate how the information he seeks would lead to the discovery of genuine and material facts to overcome the qualified immunity defense. The plaintiff's request for additional discovery is just too general for the Court to subject over thirty individuals to further discovery, especially when the majority of them represent under penalty of perjury that they had no personal involvement in the search of the van. See supra p.34 n. 24. Accordingly, the plaintiff's Rule 56(f) motion to conduct discovery on this topic is denied.

F.3d 1396, 1396 (D.C. Cir. 1997); Simpkins v. District of Columbia Gov't, 108 F.3d 366, 369

(D.C. Cir. 1997); Cameron v. Thornburgh, 983 F.2d 253, 258 (D.C. Cir. 1993). Accordingly, the

claims against the twenty defendants named in the Second Amended Complaint who did not

participate in the initial search of the plaintiff's van are dismissed.

b.      Defendants Gilman G. Udell, Donald Bracci, & John King

At the time period relevant to this case, defendant Gilman G. Udell Jr., a Commander of

the Hazardous Incident Response Division of the Capitol Police, see Fed. Defs.' Mem., Ex. 2

(Udell Decl.), authorized two bomb technicians, defendants John King and Donald Bracci, to

enter the plaintiff's van without a warrant, see id., Ex. 2, (King Decl.); id., Ex. 2, (Bracci Decl.).

In addressing the constitutionality of the defendants' actions, the Court begins its analysis "with

the basic rule that 'searches conducted outside the judicial process, without prior approval by

judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few

specifically established and well-delineated exceptions.'" Arizona v. Gant, __ U.S. __, __, 129

S. Ct. 1710, 1716 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). Two of the

exceptions that the federal defendants rely upon are the "exigent circumstances" exception,

which allows police to conduct a search where immediate action is required to protect life, avoid

serious injury, or prevent significant damage to property, e.g., Mincey v. Arizona, 437 U.S. 385,

392 (1978); Warden v. Hayden, 387 U.S. 294, 298-99 (1967); Wayne v. U.S., 318 F.2d 205, 212

(D.C. Cir. 1963), and the "automobile exception," which authorizes police to conduct a search

"'[i]f a car is readily mobile and probable cause exists to believe it contains contraband,'"

Maryland v. Dyson, 527 U.S. 465, 467 (1999) (quoting Pennsylvania v. Labron, 518 U.S. 938,

940 (1996)). As the Court discusses below, both of these exceptions justified the warrantless

search of the plaintiff's vehicle.

As to the "exigent circumstances" exception, the test for the presence of such circumstances is "whether the police had 'an urgent need' or 'an immediate major crisis in the performance of duty affording neither time nor opportunity to apply to a magistrate.'"  United States v. Johnson, 802 F.2d 1459, 1461 (D.C. Cir. 1986) (quoting Dorman v. United States, 435 F.2d 385, 391 (D.C. Cir. 1970) (en banc)).  This is an objective standard, focusing on "what a reasonable, experienced police officer would believe," and this assessment is made according to the totality of the circumstances.  United States v. Goree, 365 F.3d 1086, 1090 (D.C. Cir. 2004) (citation omitted).  And, the government must have had probable cause for their actions to rely on the exigent circumstances exception.  United States v. Halliman, 923 F.2d 873, 878 (D.C. Cir. 1991).

Here, looking at the totality of the circumstances, the Court concludes that there was an urgent need to search the plaintiff's van and that there was probable cause to do so.  Especially persuasive in this regard are the unmarked containers of liquid observed inside the van, which could have given the impression that there were explosives or other dangerous chemicals inside. From their vantage points when they looked into the van, the officers could not see the bottom of the glass jars, and thus could not tell whether wires or other devices might be connected to them. Fed. Defs.' Mem., Ex. 2 (King Decl.); see also United States v. Duran, 884 F. Supp. 552, 556 (D.D.C. 1995) (quoting United States v. Lindsey, 877 F.2d 777, 781 (9th Cir. 1989)) ("'Exigent circumstances are frequently found when dangerous explosives are involved.'").  Compounding the officers' concerns was the fact that the search took place in the aftermath of the events of September 11, 2001 (when the Capitol Building was believed to also have been targeted by terrorists on September 11, 2011, see e.g., Giles Tremlett, Al-Qaida Leaders Say Nuclear Power Stations Were Original Targets, The Guardian, Sept. 9, 2002, available at

http://www.guardian.co.uk/world/2002/sep/09/september11.afghanistan (referencing interview with two alleged al-Qaida leaders in which they "revealed . . . that the target of the fourth hijacked airliner had been the Capitol in Washington")), and the anthrax mailings to the Capitol Building, making it a known target for terrorists, and the plaintiff 's arrest while wearing an outlandish costume that the officers thought resembled a suicide bomber's vest.[27]  The officers also had reason to be suspicious about the vehicle because neighbors and restaurant employees had reported that several individuals occupied the van over several days, even though the van had been parked in the same location during that time period.[28]  And, the fact that the street was closed to pedestrian and vehicular traffic, that neighbors were told to take cover in the back of their houses, and that Bracci and King put on protective equipment before entering the van all speak to the danger that the officers reasonably assumed had existed and the need for them to take immediate action.  See Duran, 884 F. Supp. at 556 (holding that procedures conducted by officers on a vehicle hours after the owner of the vehicle fired gunshots near the White House was justified under the exigent circumstances exception to the warrant requirement).  When law enforcement personnel are "confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act on that information, even if ultimately found erroneous." Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963).  That was the situation confronting the officers here.  Accordingly, exigent

---

[27]  A picture of the plaintiff wearing the costume is attached to one of the filings.  Fed. Defs.' Mot., Ex. 4 at 12.

[28] Although it was later discovered that the van was not parked in that same location because the plaintiff had received a parking citation earlier that same day, see supra p.5 n.6, that fact is of no moment here because the "constitutionality of an official's conduct turns not on post hoc judgments about whether the search or seizure was justified or properly calibrated, but on whether it was reasonable under the tense, uncertain, and rapidly evolving circumstances that the official confronted." Higgins v. Penobscot County Sheriff's Dep't, 446 F.3d 11, 16 (1st Cir. 2006) (citing Saucier, 533 U.S. at 204-05).

circumstances justified the initial search of the plaintiff's van, and defendants Udell, Bracci, and King are entitled to qualified immunity for their actions in so doing.[29]

The "automobile exception" also provided the officers justification to conduct a warrantless search of the van. Under this exception, the police may conduct a warrantless search of a car if it is "'readily mobile, and probable cause exists to believe it contains contraband.'" Dyson, 527 U.S. at 467 (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). As stated above, the facts known to the officers at the time of the initial search support a finding of probable cause. Moreover, while the car was not "immediately mobile" because the plaintiff and Patel were in custody at the time of the search, and the plaintiff turned over the keys to his vehicle while in custody, the applicability of the exception nonetheless applies because "the inherent mobility of the [van], combined with the lesser expectation of privacy in an automobile as compared to a home or office, justify application of the exception even if the police have control over the automobile at the time of the warrantless search." United States v. Young, 371 Fed. Appx. 358, 361 (4th Cir. 2010) (citing United States v. Kelly, 592 F.3d 586, 590-91 (4th Cir. 2010)); see also California v. Carney, 471 U.S. 386, 391 (1985) ("Even in cases where an automobile [is] not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception."). Thus, the Court finds that the "automobile exception" provides further support for its conclusion that defendants Udell, Bracci, and King are immune from suit regarding the initial vehicle search.

---

[29]  As discussed infra concerning the FBI defendants who carried out the inventory search, defendants Bracci and King would also be entitled to qualified immunity in regards to their entering the van, having done so on the orders of defendant Udell.

3.     The Impoundment of the Van

a.     Defendants Douglas Edmonson & Kevin Finnerty

In March 2003, defendant Douglas Edmonson was a bomb technician for the FBI and was present during the initial search of the plaintiff's van, Fed. Defs.' Mem., Ex. 3 (Edmonson Decl.) ¶ 1, and defendant Kevin Finnerty was a member of the FBI's Joint Terrorism Task Force/National Capitol Response Squad and stationed in the Washington Field office of the FBI, id., Ex. 4 (Finnerty Decl.) ¶ 1.  After King and Bracci completed their search of the van, Edmonson and Finnerty discussed the situation and on advice from an official of the FBI, made the decision to impound the van.  Id., Ex. 3 (Edmonson Decl.) ¶ 3; id., Finnerty Decl. ¶ 6.  The Court addresses their respective situations in turn.

The federal defendants advance two arguments as to why the impoundment of the van was reasonable.  First, they argue that because the plaintiff may have been attempting to probe the level and effectiveness of the security at the Capitol Building, there was probable cause to believe that the van contained evidence related to the plaintiff's actions or intentions, or the actions or intentions of third parties.  Fed. Defs.' Mot. at 24-25.  Second, the federal defendants contend that the decision to impound the van was permissible under the "community caretaking" exception to the warrant requirement.  Id. at 25 (citing South Dakota v. Opperman, 428 U.S. 364, 368-69 (1976)).  In response, the plaintiff contends that the federal defendants lacked probable cause to seize his van, and further asserts that they did so only to obtain evidence to "justify their arrest and seizure of his person."  Pl.'s Opp'n to Fed. Defs.' Mot. at 25-26.  Furthermore, the plaintiff argues that even if the community caretaking exception applied, the impoundment should have been carried out by the Capitol Police or the Metropolitan Police Department and not the FBI.  Id. at 26.

The decision to impound a vehicle is a seizure subject to the Fourth Amendment, and must be analyzed distinctly from a concomitant inventory search. United States v. Proctor, 489 F.3d 1348, 1352 (D.C. Cir. 2007). An impoundment of a car without a warrant is "'per se unreasonable under the Fourth Amendment—subject to only several specifically established and well delineated exceptions.'" Id. (citing Minnesota v. Dickerson, 508 U.S. 366, 372 (1993)). One exception recognizes that "[i]n the interests of public safety and as part of what the [Supreme] Court has called 'community caretaking functions,' automobiles are frequently taken into police custody. Opperman, 428 U.S. at 368 (citing Cady v. Dombrowski, 413 U.S. 433, 441 (1973)). "The community caretaking exception recognizes that the police perform a multitude of community functions apart from investigating crime. . . . [ and it] encompasses law enforcement's authority to remove vehicles that impede traffic or threaten public safety and convenience." United States v. Coccia, 446 F.3d 233, 238 (1st Cir. 2006) (citing Opperman, 428 U.S. at 368-69). In this circuit, a community caretaking impoundment "must be based on (1) a reasonable standard police procedure governing decisions on whether to impound vehicles and (2) the police must follow the procedure in the case involved." United States v. Smith, 522 F.3d 305, 314 (3rd Cir. 2008) (interpreting the District of Columbia Circuit holding in Proctor).

As a starting point, the Court finds that the impoundment of the van in this case was reasonable under the circumstances. When that decision was made, both the plaintiff and Ms. Patel were in custody and were likely to be detained for an indefinite period of time. Indeed, the plaintiff was later indicted for making a false bomb threat, a charge that carries up to a ten-year term in prison. See 18 U.S.C. § 844(e). Consequently, there was nobody available to take possession or look after the van, thus increasing the chances it would be towed or vandalized. Fed. Defs.' Mem., Ex. 3 (Edmonson Decl.) ¶ 3; id., Ex. 4 (Finnerty Decl.) ¶ 6. In fact, the van's

out-of-state registration and parking ticket received earlier that day for parking in a restricted area, Pl.'s Opp'n to Fed. Defs.' Mot., Ex. B and C, would have reasonably caused the officers to assume that it would accumulate additional parking tickets or even be towed in the event the plaintiff and Ms. Patel were confined for an extended period of time. "Case law supports the view that where a driver is arrested and there is no one <u>immediately</u> on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car." <u>Vega-Encarnacion v. United States</u>, 344 F.3d 37, 41 (1st Cir. 2003); <u>United States v. Brown</u>, 787 F.2d 929, 932 (4th Cir. 1986) (finding impoundment reasonable in part because no known individual was immediately available to take custody of the car); <u>United States v. Goodrich</u>, 183 F. Supp. 2d 135, 141 (D. Mass. 2001) ("[W]hether an appropriate person is available to move the car is central to an evaluation of the reasonableness of any decision to seize a vehicle.").

Even if the impoundment was unlawful because it was not made pursuant to standard police procedure, that requirement was not clearly established in this jurisdiction in March of 2003 and thus it would not have been clear to a reasonable officer that the decision to impound the van was unlawful. In <u>Proctor</u>, decided in 2007, the District of Columbia Circuit discussed vehicle impoundments in detail and, relying on <u>Colorado v. Bertine</u>, 479 U.S. 367 (1987), concluded that decisions to impound vehicles should be governed by a reasonable standard police procedure. <u>See</u> 489 F.3d at 1352-54. Importantly, the circuit court acknowledged that its pre-<u>Bertine</u> precedent held that decisions to impound should be reasonable, <u>see id.</u> at 1354 n.3 (citing <u>United States v. Reese</u>, 561 F.2d 894, 903 n.17 (D.C. Cir. 1977)), and added that "[i]t appears that we have not addressed the issue again until now." <u>Id.</u> The District of Columbia Circuit also made clear that it disagreed with the First Circuit, which has held that "an

impoundment is reasonable so long as it 'serves the government's 'community caretaking' interest.'" <u>Id.</u> at 1354.

In any event, because the decision to impound the van was reasonable, and because it would not have been clear to a reasonable officer that impounding the van would be unlawful in these circumstances, defendants Edmonson and Finnerty are entitled to qualified immunity for their decision to impound the van.

4.      <u>The Inventory Search of the Van</u>

a.      <u>Defendant Kevin Finnerty</u>

In addition to being involved in the decision to impound the van, defendant Finnerty made the decision to conduct the inventory search of the van.  Fed. Defs.' Mem., Ex. 4 (Finnerty Decl.) ¶ 6.  The Court analyzes the inventory search separately from the impoundment.  <u>Proctor</u>, 489 F.3d at 1353.

The Second Circuit Court has offered the following overview of inventory searches:

> It is well recognized in Supreme Court precedent that, when law enforcement officials take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without regard to whether there is probable cause to suspect that the vehicle contains contraband or evidence of criminal conduct.

<u>United States v. Lopez</u>, 547 F.3d 364, 369 (2d Cir. 2008) (citing <u>Illinois v. Lafayette</u>, 462 U.S. 640, 643 (1983)).  "A proper inventory search is merely 'an incidental administrative step following arrest and preceding incarceration,'" <u>United States v. Banks</u>, 482 F.3d 733, 739 (4th Cir. 2007) (quoting <u>Lafayette</u>, 462 U.S. at 644)), and is not performed "to detect crime or serve criminal prosecutions . . . [but] (1) to serve to protect an owner's property while it is in police custody; (2) to protect the police against spurious claims of lost or stolen property; and (3) to protect the police from potential danger," <u>Lopez</u>, 547 F.3d at 369 (citing <u>Opperman</u>, 428 U.S. at

369).  A condition precedent to an inventory search is lawful possession of the vehicle.  United States v. Holly, 219 F. Supp. 2d 117, 129 (D.D.C. 2002).

Moreover, an inventory search must "'be conducted according to standardized criteria,'" Proctor, 489 F.3d at 1355 (quoting Bertine, 479 U.S. at 374), to prevent it from becoming "a ruse for a general rummaging in order to discover incriminating evidence," Florida v. Wells, 495 U.S. 1, 4 (1990).  Thus, "[t]he Fourth Amendment requires . . . that an inventory search be reasonable and, if a standard procedure for conducting the inventory search is in effect, it must be followed."  Proctor, 489 F.3d at 1355; see also United States v. Matthews, 591 F.3d 230, 235 (4th Cir. 2009) ("For the inventory search exception to apply, the search must have been conducted according to standardized criteria . . . and performed in good faith.") (internal citations and alteration omitted); United States v. Kennedy, 427 F.3d 1136, 1143 (8th Cir. 2005) ("The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable.").

Here, the Court concludes that Agent Finnerty's decision to order the inventory search was reasonable.  At that point, because the officers were in possession of the keys to the van, and because there was no one available to take custody of the van, the FBI could have reasonably believed that they had lawful possession of the van.  See Vega-Encarnacion, 344 F.3d at 41; Brown, 787 F.3d at 932; Goodrich, 183 F. Supp. 2d at 140-41.  Moreover, in light of the concern that the van may have contained evidence concerning the plaintiff and Patel's actions in probing the level and effectiveness of security at the Capitol Building, or evidence related to a bomb hoax in the Capitol Building, it was reasonable to conclude that the FBI would ultimately have authority to take possession of the van.  See Duran, 884 F. Supp. at 554 (noting how the vehicle

was towed to an FBI facility following gunfire incident involving vehicle's owner near the White House).

Once the decision to impound the van was made, the next logical step would be to order an inventory search of the vehicle.  E.g., Banks, 482 F.3d at 739 (explaining that a proper inventory search is merely an incidental administrative step following arrest and preceding incarceration).  Indeed, Agent Finnerty represents that he made the decision to inventory the van pursuant to FBI policy, Fed. Defs.' Mem., Ex. 4 (Finnerty Decl.) ¶ 6, which provides that "[u]pon seizing personal property, a prompt thorough search of the contents of the property, whether locked or unlocked, including any containers located therein whether locked or unlocked, should be conducted and an FD-302 prepared showing the results of the inventory," Fed. Defs.' Mot., Ex 3., at 52 (Section 5-8.1 of the Legal Handbook for Special Agents).  Accordingly, once the decision to impound the van was made, it was a logical and reasonable consequence that an inventory search be conducted.  Agent Finnerty is therefore also entitled to qualified immunity concerning the inventory conducted of the van.

####        b.        The Remaining FBI Agents

The plaintiff alleges that FBI defendants "Cejpeck, Chinchilla, Collins-Morton, Rankin, Sidener, [and] Udell . . . violated [his] Fourth Amendment rights by searching his van."  Am. Compl. ¶ 97.  The plaintiff also claims that "FBI Defendants Arseni, Edmonson, Garten, and Godbold also violated [the plaintiff's] Fourth Amendment rights by directing, supervising, participating in, and/or otherwise assisting with the search of the van."  Id.

Similar to the Capitol Police officers who had no personal involvement in the search of the van, see supra p.39-40, four FBI defendants declared under oath that they did not participate

in the inventory search of the van either.[30]  The plaintiff has not proffered any evidence to the contrary, and, therefore, these four agents are entitled to summary judgment.

In addition, the remaining FBI defendants represent that they carried out the inventory search pursuant to FBI policy or upon the instructions from Agent Finnerty.[31]  These defendants are entitled to qualified immunity because it would not have been clear to a reasonable officer in these circumstances that executing the inventory search was unlawful.  As noted earlier, the FBI Legal Handbook for Special Agents sets forth standardized procedures for conducting inventory searches.  Fed. Defs.' Mot., Ex. C at 51-54 (sections 5-8, 5-8.1, and 5-8.2).  In addition, the instructions from Agent Finnerty provided these defendants an objectively reasonable basis to believe that the inventory search was lawful.  And in fact, the inventory search was not illegal.  In any event, "[p]lausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists . . . ."  Bilida v. McCleod, 211 F.3d 166, 174-175 (1st Cir. 2000); Lauro v. Charles, 219 F.3d 202, 216 n.10 (2nd Cir. 2000) ("[T]he existence of qualified immunity is further supported by the fact that [the defendant] was apparently following orders given by his superiors when he took [the plaintiff] on the perp walk.").  Accordingly, the FBI agents who conducted the inventory search are entitled to qualified immunity.

---

[30]  This group includes the following FBI defendants: (1) Giulio J. Arseni; (2) John Gardner Jr.; (3) Chris Ginsburg; and (4) Gerhard S. Vienna.  See Fed. Defs.' Mot., Ex. 3 at 1-2, 18-19, 54-55; id., Ex. 5 at 1-2.

[31]  This group includes the following agents:  (1) Jennifer Cepjeck; (2) Sandra I. Chinchilla; (3) Paul Garten; (4) Melissa R. Godbold; (5) Ronald E. Menold II; (6) Michelle Rankin; and (7) Kara D. Sidener.  See Fed. Defs.' Mot., Ex. 3 at 3-10, 20-21, 23-24, 31-32, 39-40.  Defendant Mary Collins Morton appears to belong in this group as well, because despite not submitting a declaration, she is listed in the FBI report associated with the inventory search as one of the participants.  E.g., id. Ex. 3 at 41.

## CONCLUSION

For the foregoing reasons, the Court dismisses five of the six Counts against the United States, but concludes that the plaintiff has adequately stated a claim for false imprisonment arising out of the stopping of his van in January of 2004. The Court also denies the District of Columbia's motion to dismiss, and denies its motion for summary judgment without prejudice pending further discovery being provided to the plaintiff. Finally, summary judgment is awarded to the thirty-seven individual Federal Defendants on the plaintiff's Bivens claims.

**SO ORDERED** this 4th day of February, 2011.[32]

_____/s/_____
REGGIE B. WALTON
United States District Judge

---

[32] An order will be issued contemporaneously with this memorandum opinion (1) granting the federal defendants' motion to dismiss Counts One, Three, Four, and Five of the United States Complaint for lack of subject-matter jurisdiction, (2) granting in part the federal defendants' motion to dismiss Count Six of the United States Complaint for lack of subject-matter jurisdiction, (3) granting in part the federal defendants' motion to dismiss Count Six of the United States Complaint for failure to state a claim upon which relief can be granted, (4) denying the federal defendants' motion to dismiss Count Two, (5) denying the District of Columbia's motion to dismiss the Second Amended Complaint; (6) denying the District of Columbia's motion for summary judgment without prejudice; (7) granting the federal defendants' motion for summary judgment regarding the Bivens claims, and (8) directing the parties to appear before the Court for a status conference at 2:00 p.m. on February 28, 2011, for the purpose of setting forth a schedule for discovery related to the plaintiff's false imprisonment claim.